Filed 7/31/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PETER REILLY, | |
| Plaintiff and Respondent, | G046291 |
| v. | (Super. Ct. No. 30-2009-00333233) |
| INQUEST TECHNOLOGY, INC., et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Frederick Paul Horn, Judge. Affirmed.

Gordee, Nowicki & Augustini and Bryan Arnold for Defendants and Appellants.

Law Office of Anthony Kornarens and Anthony Kornarens for Plaintiff and Respondent.

The Independent Wholesale Sales Representatives Contractual Relations Act of 1990 (the Act) was created to protect sales representatives who receive commissions from, but are not employed by, a manufacturer. (Civ. Code, § 1738.10 et seq.)[1] The Act requires manufacturers to enter into written contracts with their sales representatives to provide "security and clarify the contractual relations" between the parties. (§ 1738.10.) In this case, Peter Reilly agreed to use his experience and connections in the high-tech electronic industry to help grow Inquest Technology, Inc. (Inquest), owned by David Singhal and Pradeep Sethia (referred collectively and in the singular as Inquest, unless the context indicates otherwise). Reilly prepared a written document outlining his business relationship with Inquest, which included his understanding he would receive 50 percent of the net profits from all sales resulting from his efforts and contacts. The parties did not execute this document as a written contract, but the jury ultimately determined Inquest accepted the terms due to Inquest's owners' conduct.

The jury entered a general verdict in favor of Reilly, awarding him $2,065,702 for owed commissions. It also determined, by a special findings verdict, that Inquest, Singhal, and Sethia violated the terms of the Act by willfully failing to provide Reilly with a written contract. Pursuant to the Act's penalty provisions, the trial court awarded Reilly treble damages. On appeal, Inquest maintains the court erroneously concluded the Act applied and there was insufficient evidence to support the jury's verdict and damage award. We find these arguments lack merit, and we affirm the judgment.

I

Over the course of his career, Reilly worked for several technology businesses and gained experience in electronics and industrial manufacturing and

---

[1] All further statutory references are to the Civil Code.

2

operations. In 1990, Triconex hired Reilly as vice president of operations and vice president of manufacturing. Triconex manufactures safety and control systems for oil, gas, chemical, and nuclear industries. Triconex is a division of Invensys, a world-wide technology manufacturer.

At the time, Singhal and Sethia jointly owned a different company called American Imex, and they supplied printed wiring boards made in India. One of their customers was Cal Quality, who resold parts to Triconex. However, Triconex did not buy circuit boards directly from American Imex.

In 1999, Reilly retired from his position at Triconex. During his employment, Reilly claimed to have developed "extensive contacts" in the industry. That same year, Singhal and Sethia converted American Imex into a corporation called Inquest, to sell electronic parts and components manufactured in China rather than India. The parts included printed wiring boards, spines (sheet metal used to enclose electronic equipment), and chassis (a cabinet used to hold spines).

Reilly and Singhal were long-time friends, and they discussed having Reilly help them expand their business. Reilly offered to provide Inquest with his expertise and contacts in the industry to help bring in business, including his well-established connection with his former employer Triconex/Invensys. The parties understood Inquest would have to satisfy certain requirements before being approved as a Triconex vendor, and after that, sales with Triconex would grow.

In September 2003, Reilly put in writing the terms of the parties' verbal agreements and negotiations. The document stated, in relevant part, the following pact:

"It is agreed that [Reilly's] extensive experience in the electronics and [i]ndustrial manufacturing segments together with his contacts in the industry could be beneficial in helping to grow the business of [Singhal and Sethia] (namely Inquest . . .).

"It is also agreed that [Singhal and Sethia] have put together a very useful and sound company (Inquest . . .), which is poised for expansion based on utilization of

3

the low cost manufacturing opportunities presently available in China and other Asian countries.  [Singhal and Sethia] have established many useful contacts in this arena and are presently trading with those contacts on an ongoing basis.

"In [Reilly's] opinion it is essential[] for a company that is extolling the benefits of global manufacturing capabilities, to have an 'Internet International Presence[.']  Therefore, one of his first tasks will be to establish a website for the company.  As this will be a company asset, [Singhal, Sethia, and Reilly] will establish a reasonable cost for this that the company can afford.

"[Singhal, Sethia, and Reilly] desire that the skills and capabilities of each of themselves be applied to growing the business . . . .  [¶] . . .  As many things could change over the next twelve months it is decided not to change the structure of the company at this time.  [Reilly] will be employed by the company and given the title of 'Vice President of Business Development[.']  He [will] be remunerated on a commission only basis as agreed to in this document in paragraphs 7 and 10."

The two paragraphs describing the payment of commissions provided as follows:  Paragraph 7 stated, "It is agreed that any jobs, orders or contacts that [Reilly] brings to the company that result in orders being placed with the company or [Singhal's or Sethia's] entities, then the profits from these activities will be shared equally with [Reilly].  That means that the company or entity [will] get 50 [percent] of the profit before [t]ax and [Reilly will] get 50 [percent] of the profit before [t]ax.  Each entity will be responsible for [its] own tax liabilities."

And paragraph 10 provided, "It is agreed that any inquiry or order placed with company through the website or from information on the website, the profits from these projects will be shared 60 [percent] for the company and 40 [percent] to [Reilly], unless it is from an existing customer that has been identified by [Singhal or Sethia] prior to the inquiry, to be outside this agreement."

4

In addition, the parties agreed Reilly would be given a desk and telephone at the Inquest office. Reilly agreed to provide his own computer that would be linked to the "Internet and [Singhal and Sethia]." The agreement stated that to assure fairness, the costs involved in producing the products must be disclosed, and freight costs incurred by the company would be considered to project expenses added to the "cost of the project before profits are calculated."

The agreement ended with the following statements: (1) "These activities will start as soon as [the parties] are in agreement. Each person will be responsible for his own allocation of time to this project[;]" and (2) "A discussion needs to take place regarding what happens if the company becomes very successful as a result of [Reilly's] activities. This discussion will determine how [Reilly] can be adequately rewarded if such an event occurs."

The parties disputed whether the terms of the agreement were accepted. Reilly asserted that based on his discussions with Singhal and Sethia, he drafted the document so the parties could have further discussions about it and determine if they were in agreement. He met with Singhal and Sethia, he provided them with a copy of the document, and he read every paragraph out loud. After reading each paragraph he would pause and ask, "Okay?" He recalled neither Singhal nor Sethia asked questions or objected to his statements. After reading the entire document to Singhal and Sethia, Reilly asked, "Are we all agreed?" and both parties stated, "Yes," and shook hands.

On the other hand, Singhal and Sethia asserted they did not agree to the terms Reilly presented. Singhal recalled he believed the "50/50" split of profits was too much and he told Reilly he would have to perform before the company committed to the terms. Sethia asserted he was not present at the meeting and did not see the document until many years later (in 2009).

After the meeting, Reilly began working on getting Inquest some customers such as Triconex. In May 2004, he obtained vendor approval from Triconex. He also

5

secured two orders: (1) $90,536 for blanks and spines; and (2) $12,500 for tooling of the spines.

Inquest paid Reilly a series of "advances" in increments of $1,000 and $1,500 checks. Inquest advised Reilly they were not able to provide him an accounting.

In August 2004, Triconex/Invensys began using an online bidding system to acquire spines. Reilly submitted a bid on behalf of Inquest, but it was not successful. A few months later, Reilly moved to Visalia where he began working for a different company. Reilly stated he did not seek any other purchase orders for Inquest, stating it was not his job.

Inquest did not receive any more orders from Triconex for approximately one year. However in June 2005, Triconex asked Inquest to bid on five printed circuit boards. In March 2006, Inquest sent Reilly an e-mail, formally ending their relationship (and backdating the date of termination to July 1, 2005).

In December 2006, Singhal and Sethia finally provided Reilly with an accounting of the amounts Inquest owed him. They paid him $5,348.48 and wrote on the memo line of the check, "FINAL SETTLEMENT." This sum brought Reilly's total commission to $14,348.48.

Reilly believed this was not a final payment and repeatedly asked for an accounting and commissions owed on later profits due to Inquest's ongoing sales with Triconex and Reilly's other contacts. For the next two years, Reilly unsuccessfully tried to meet with Singhal and Sethia, and he also e-mailed Singhal to ask for more money. In September 2008, Singhal sent Reilly $1,500 and wrote in the memo line, "consulting fee."

Because this sum was less than Reilly expected for his ongoing commissions resulting from sales to Triconex, Reilly contacted a lawyer and filed a lawsuit in December 2009. The operative first amended complaint alleged claims for: (1) breach of contract; (2) breach of implied in fact contract; (3) breach of the covenant of

good faith and fair dealing; (4) conversion; (5) constructive trust; (6) statutory unfair competition; (7) common counts; (8) accounting; (9) declaratory relief; and (10) violation of the Act. The gravamen of the lawsuit was Reilly's belief the parties agreed he would be compensated for 50 percent of the net profits from continuing sales resulting from his Triconex contacts and efforts on behalf of Inquest.

Reilly filed a motion for summary adjudication about whether Inquest had a duty under the Act to enter a written contract with him. Inquest did not oppose the motion. The court granted it, concluding Inquest was a manufacturer subject to the duties outlined in the Act.

After a lengthy trial, the jury found in favor of Reilly and assessed $2,065,702 for damages. The jury determined Inquest also willfully failed to comply with the Act when it did not provide Reilly with a signed contract containing all the terms required by the Act. As mandated by the Act, the trial court trebled the damages.

Thereafter, the court concluded Singhal and Sethia were alter egos for the corporation. It ruled Inquests $6,197,106 trebled liability applied to Singhal and Sethia individually and entered judgment against them. The owners later filed Chapter 11 bankruptcy petitions. Inquest also petitioned for bankruptcy and due to the automatic stay, judgment was not entered against it until May 15, 2012.[2]

## II

### A. *Summary Adjudication*

Reilly's 10th cause of action alleged Inquest violated the Act by failing to: (1) enter into a written contract with him; (2) provide him with a signed copy of the contract; (3) pay commissions; and (4) provide the required written information and documentation with the commission payments. Before trial, Reilly filed a motion for

---

[2] We treat Inquest's notice of appeal filed after the superior court entered the jury verdict, but before it rendered judgment, as filed immediately after entry of judgment. (Cal. Rules of Court, rule, 8.104(e).)

summary adjudication regarding whether Inquest had a duty to enter into a written contract with him as described by the Act.  (§ 1738.13.)  Relying on his own declaration and Inquest's responses during discovery to requests for admissions, Reilly asserted he was an independent sales representative and Inquest was a wholesale manufacturer within the meaning of the Act.

Inquest did not oppose the motion and the court granted it, concluding Inquest owed a duty, as a matter of law, to enter into a written contract as mandated by the Act.  Necessarily implied in this ruling was the legal determination the Act governed the business relationship between Reilly and Inquest.

Before we begin our analysis, some background information about the Act is instructive and helpful.  The Legislature enacted this statutory scheme based on its determination "independent wholesale sales representatives are a key ingredient to the California economy" and there was a need to provide "wholesale sales representatives [who] spend many hours developing their territory in order to properly market their products" with "unique protection from unjust termination of the territorial market areas." (§ 1738.10.)  The Legislature expressed it was its intent "in enacting this act to provide security and clarify the contractual relations between manufacturers and their nonemployee sales representatives."  (*Ibid.*)  A manufacturer found to be in violation of either of these terms of the Act, "shall be liable to the sales representative in a civil action for treble the damages proved at trial."  (§ 1738.15.)

To insure the necessary clarity in contractual relations, the statutory scheme provides that whenever a manufacturer is engaged in a business deal with a wholesale sales representative, who is not an employee, there is a duty to enter a written contract containing information relating to how commissions will be calculated and details regarding the assigned territory.  (§ 1738.13, subd. (b)(1)-(5).)  In addition, the manufacturer has a duty to provide documentation when it makes commission payments, such as an accounting of the orders and how the commission was calculated.  (*Ibid.*)

8

In short, the Act was intended to protect independent contractors who facilitate the relationship between manufacturers and buyers of wholesale products. For Reilly to prevail on his summary adjudication motion seeking application of the Act's protections, he needed to prove: (1) Reilly was a wholesale sales representative protected by the Act; and (2) Inquest was a manufacturer producing a wholesale product falling within the meaning of the Act. The parties agree the evidence in this case was undisputed and application of the Act is a question of law this court must review de novo. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)

Turning to the first element, we conclude Reilly was a wholesale sales representative. Section 1738.12, subdivision (e), defines "'[w]holesale sales representative'" as "any person who contracts with a manufacturer, jobber, or distributor for the purpose of soliciting wholesale orders, is compensated, in whole or part, by commission, but shall not include one who places orders or purchases exclusively for his own account for resale and shall not include one who sells or takes orders for the direct sale of products to the ultimate consumer."

There was undisputed evidence supporting the first three factors that Reilly (1) contracted with a manufacturer, (2) solicited wholesale orders, and (3) was compensated by commission. To support his motion, Reilly submitted a declaration and stated he contracted with Inquest to "make calls to attempt to obtain business" and solicit wholesale orders from customers and contacts such as Triconex. Inquest does not dispute it hired Reilly for this purpose and agreed to pay him a commission.

The statutory definition also contains two factors limiting the scope of sales representatives covered by the Act: The wholesale sales representative must (1) not place orders for his own account for resale; nor (2) sell or take orders from "the ultimate consumer." (§ 1738.12, subd. (e).)

We recognize the phrase "ultimate consumer" is not specifically defined in the Act and the parties dispute its meaning. Basic rules of statutory construction say we

9

"'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'" (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977-978 (*Wilcox*).) The stated purpose of the Act is to protect independent contractors working to sell a manufacturer's *wholesale* products to a buyer, who cannot be the "ultimate consumer." Thus, clearly not all salespeople are sheltered by the Act. The Legislature intended to safeguard only nonemployee "middle-men" sales representatives dealing with wholesale goods.

"Wholesale" means "the sale of commodities in quantity usually for resale (as by a retail merchant)." ("wholesale." *Merriam-Webster.com.* 2013. <http://www.merriam-webster.com/dictionary/wholesale> [as of June 20, 2013].) Wholesale is generally understood to be the opposite of "[r]etail" which is "to sell in small quantities directly to the ultimate consumer." ("retail." *Merriam-Webster.com.* 2013. <http://www.merriam-webster.com/dictionary/retail> [as of June 20, 2013].) Stated another way, typically a wholesale manufacturer does not sell large quantities directly to the consumer, i.e., the "one that utilizes economic goods." ("consumer." *Merriam-Webster.com.* 2013. <http://www.merriam-webster.com/dictionary/consumer> [as of June 20, 2013].) Accordingly, the Act's use of the term "ultimate consumer" recognizes wholesale sales representatives do not sell small quantities to the persons utilizing the goods but rather sell commodities in a quantity appropriate for resale by a retail store or other larger scale middle-man buyer.

Recognizing this distinction between wholesale and retail, the Legislature designed the Act to specifically exclude from coverage salespersons and retailers purchasing manufactured wholesale products for themselves to later resell to the public (the ultimate consumer) for a profit. To achieve this stated goal, the Legislature expressly excluded a salesperson who "places orders or purchases exclusively for his own

10

account for resale" or who sells or takes orders from "the ultimate consumer."
(§ 1738.12, subd. (e).)

In this case, Reilly attested he never ordered Inquest's electronic components "for his own account for resale." (§ 1738.12, subd. (e).) Indeed, Inquest does not allege Reilly ever attempted to purchase anything for himself or attempted to resell for his own profit any parts or electronic equipment. Likewise, there is also no evidence suggesting Reilly sold or took orders "for the direct sale of products to the ultimate consumer." (§ 1738.12, subd. (e).) To the contrary, Reilly solicited business from Triconex, a manufacturer who used Inquest's parts to make other products. Inquest admitted its electronic parts were not intended to be sold to members of the public, rather they are "intended to be incorporated into other products that are then sold to end-users." We conclude the evidence established as a matter of law Reilly was a wholesale sales representative as defined by the Act.

For the Act to apply, Reilly also had to establish Inquest was a manufacturer as defined by the Act. Section 1738.12, subdivision (a), defines "[m]anufacturer" as "any organization engaged in the business of producing, assembling, mining, weaving, importing or by any other method of fabrication, a product tangible or intangible, intended for resale to, or use by the consumers of this state."

On appeal, Inquest refers to itself as a manufacturer and admits it was engaged in a manufacturer-to-manufacturer relationship with Triconex. The statutory definition broadly includes importers of products "tangible or intangible." (§ 1738.12, subd. (a).) And there is no dispute Inquest imports electronic parts and components, which certainly are tangible products.

However, Inquest disputes whether it is a manufacturer subject to the Act, stating, "the Act does not apply to the sale of every product, but only to products that are directly purchased or used by 'consumers.'" It argues there is "nothing in the language of the [Act] that even remotely suggests it was designed to apply to sales of components

11

between manufacturers."  In support of this interpretation, Inquest focuses on the last phrase of the definition, requiring the manufacturer produce a "product . . . intended for resale to, or use by the consumers of this state."  (§ 1738.12, subd. (a).)  It reads this language to mean the Act applies only to manufacturers of finished goods sold for immediate public use, rather than the sale of parts incorporated by the buyer into other products to later be resold.

To support its interpretation, Inquest refers to common and legal definitions of the term "consumer," similar to the one we used above in our discussion of wholesale sales representatives.  To briefly summarize, a "consumer" generally is a person who buys or uses goods or services with no intention of resale.  Inquest argues, "Had the Legislature intended the Act to include sales between manufacturers, it would not have used the word 'consumer'" and it is a mistake to interpret the word "consumer" to include manufacturers.  We conclude Inquest misconstrues the statutory language and the Legislature's intent.

As stated earlier, in interpreting a statute we must "'ascertain the intent of the Legislature so as to effectuate the purpose of the law.'  [Citation.]  The words of the statute are the starting point. . . .  'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .'  [Citation.]  If the language permits more than one reasonable interpretation, however, the court looks 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.'  [Citation.]  After considering these extrinsic aids, we 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'  [Citation.]"  (*Wilcox, supra,* 21 Cal.4th at pp. 977-978.)

12

We appreciate section 1738.12, subdivision (a), uses the term "consumers," however, we do not interpret the statutory definition as requiring the manufacturer to sell a finished product directly to the *ultimate* consumer. First, this interpretation would be at odds with the Legislature's intent to protect *wholesale*, as opposed to *retail*, sales representatives. Second, such an interpretation would directly contradict subdivision (e)'s definition of a wholesale sale representative, *expressly excluding* anyone who "sells or takes orders for the direct sale of products to the ultimate consumer." As noted above, if Reilly sold or took orders from the "ultimate consumer" The Act would not protect him. Thus, it would be absurd to interpret the definition of "manufacturers" as being limited to those who sell directly to the "ultimate consumer." Such an interpretation would effectively leave no one protected under the Act. "'"It is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." [Citations.]' [Citations.]" (*Baker v. American Horticulture Supply, Inc*. (2010) 186 Cal.App.4th 1059, 1073 (*Baker*).) The definition of manufacturer must be read in the context of the entire statute, created to protect nonemployee *wholesale* sales representatives who are *not* selling to the ultimate consumer.

For this reason, we conclude the phrase "intended for resale to, or use by the consumers of this state" (§ 1738.12, subd. (a)), must be interpreted to simply require an *intention* by the manufacturer that its product will eventually be resold or used by a California consumer. The phrase does not require the manufacturer harbor both an intention and ability to directly sell to consumers in California. The limiting factor created by this language is the intent to sell to consumers within this state, as opposed to consumers elsewhere.

The Legislature did not articulate what policy would be promoted by excluding manufacturers producing or importing products intended for eventual resale or use by out-of-state consumers. However, there is support for this interpretation

13

elsewhere in the statutory scheme. For example, section 1738.13, subdivision (a), mandates that a manufacturer must enter into a written contract when it uses the services of a wholesale sales representative "to solicit wholesale orders at least partially *within this state . . . .*" (Italics added.) Moreover, section 1738.10, containing the legislative findings and intent, announces the Legislature enacted this statutory scheme based on its determination "independent wholesale sales representatives are a key ingredient to the *California* economy" and sales representatives must be "provided unique protection from unjust termination of the *territorial market areas,*" presumably in California. (*Ibid;* italics added.) And finally, section 1738.14 mandates a manufacturer "who is not a resident of this state, and who enters into a contract regulated by this chapter is *deemed to be doing business in this state* for purposes of personal jurisdiction." (Italics added.) These provisions, like the definition of manufacturer, limit the Act's scope to cover manufacturers hiring salespersons to soliciting wholesale orders within California, having territories "at least partially" within our state. Section 1738.12 simply provides the added requirement the manufacturer *intend* for its products to be eventually used or resold to California consumers.

Alternatively, Inquest asserts for the first time in its reply brief that the word "product" necessary means a finished retail product or consumer goods because the Act does not use the words "components" or "parts." This argument is a slight variation of its prior argument seeking to limit the Act's scope to only manufacturers selling products to the "ultimate consumer." The difference is Inquest now asks us to clarify the Act by adding words to the statute to limit the scope of possible "products," and therefore also, the manufacturers covered by the statutory scheme. We find no reason to alter the words of the statute because the current wording effectively achieves the Act's intent.

We find *Baker, supra,* 186 Cal.App.4th 1059, instructive. The court agreed with appellant's contention proof of a manufacturer's "willfulness" was not a prerequisite to prevailing under the Act, but it was an element required for an award of treble the

14

damages. (*Id.* at p. 1072.) It rejected "respondent's theory that the Legislature intended to provide a monetary remedy only for willful violations of the statutory scheme, leaving nonwillful violations without any remedy whatsoever. Respondent's theory is predicated on a literal reading of the statutory scheme . . . . This lacuna requires us to construe the statutory scheme. We are 'loathe' to 'add' language to the statutory scheme except in the extreme case. [Citation.] This is an extreme case and we explain why this legislative drafting omission must be corrected." (*Id.* at pp. 1072-1073.)

The *Baker* court reasoned, "A sales representative who has suffered damages as a result of a nonwillful violation of the Act should not be precluded from obtaining any recovery under the Act. Surely, the Legislature did not intend to pass a toothless statute. Otherwise, if a sales representative sued his manufacturer but was able to prove only a nonwillful violation, he would be required to pay the violator's reasonable attorney fees and costs since the violator would be the prevailing party pursuant to section 1738.16. This is the antithesis of 'unique protection' for the intended salesperson. (§ 1738.10.) The Legislature did not intend such an absurd result that would have a chilling effect on the willingness of sales representatives to sue for damages under the Act." (*Baker, supra,* 186 Cal.App.4th at p. 1073, fn. omitted.) The court noted neither the legislative intent nor history gave any indication the Act intended to exclude a nonwillful violation. (*Id.* at p. 1074.) To the contrary, the Act was enacted to broadly protect wholesale sales representatives and thus expanding the Act to achieve this objective is consistent with the Act's intent.

The case before us is not an extreme situation, calling for the addition of language limiting the number of manufacturers covered by the Act. To the contrary, if we were to insert language limiting the types of wholesale products we would be violating the clear intent of the statute and creating an absurd result. There is simply no policy reason to hold the Act applies only to manufacturers importing a *finished* product made exclusively for the ultimate consumers and at the same time exclude salespeople

15

hired to sell products to the ultimate consumers. (§ 1738.12, subd. (e) [definition of wholesale sales representatives].) The Act was enacted and specifically designed to protect the business of those selling wholesale not retail goods.

Moreover, we note the Legislature enacted a very broadly worded definition to include any manufacturer in the business of "producing, assembling, mining, weaving, importing, or . . . any other method of fabrication." (§ 1738.12, subd. (a).) The kinds of businesses included in the Act appear limitless, and largely include "product[s] tangible or intangible." (*Ibid.*) There is nothing to suggest the Legislature intended to narrow the scope of possible products to exclude parts or components. The only stated limitation is that the manufacturer must solicit wholesale orders in California and *intend* for its goods to be later resold or used by a California consumer, promoting California's economy.

In summary, we conclude the Act applied to Inquest's use of a wholesale sales representative to solicit orders of large quantities of electric parts and components from a buyer who was not the ultimate consumer. The trial court properly granted the summary adjudication motion.

B. *Waiver*

Although we have concluded the summary adjudication ruling was correct, we also note Reilly correctly asserted Inquest later waived its right to challenge the ruling by implementing a litigation strategy at trial that whole heartedly adopted the ruling.[3]

_____

[3] Reilly suggests the issue of whether the Act applied was waived due to Inquest's failure to oppose the summary adjudication motion. Not so. To prevail on the motion, the burden fell on Reilly to submit evidence sufficient to establish each element necessary to sustain a judgment in his favor. "While subdivision (b) of section 437c allows the court, in its discretion, to grant summary judgment if the opposing party fails to file a proper separate statement, this provision does not authorize doing so without first determining that the moving party has met its initial burden of proof." (*Thatcher v. Lucky Stores, Inc.* (2000) 79 Cal.App.4th 1081, 1086.)

Inquest was fully aware of the legal issue at stake and the potential consequences if the Act was found to apply by the court ruling on the summary adjudication motion. The strategy for Inquest's silence with respect to the motion became clear 10 days before trial, when it filed a motion in limine that not only adopted, but championed the court's ruling. The motion requested an order excluding evidence of a written contract, arguing the court, in making the summary adjudication ruling, necessarily also "established and affirmed" the absence of any written contract between Inquest and Reilly.

Although Inquest lost on this motion, it proceeded by adhering to a trial strategy that accepted application of the Act. Nowhere in the record did Inquest object to application of the Act or suggest to the trial court that its ruling on the summary adjudication motion was erroneous. Rather, during closing argument, Inquest's counsel argued Reilly was a salesman under the Act, merely entitled to commissions on the orders placed while he was actively working for Inquest. Inquest *jointly submitted* three specially drafted jury instructions regarding the elements of Reilly's 10th cause of action regarding violation of the Act. Moreover, the morning after closing arguments, Inquest and Reilly submitted a joint stipulation for an additional instruction asking the jury to make a special finding about application of the statute of limitations to the cause of action relating to the Act.

Inquest cannot now complain the cause of action and treble damages are objectionable on the theory the Act does not apply to these parties and this dispute. "The doctrine of invited error bars an appellant from attacking a verdict that resulted from a jury instruction given at the appellant's request." (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653 [waived issue of whether lost pension benefits recoverable by stipulating to instruction requiring jury to assess such damages].) "'Under the doctrine of invited error, where a party, by his conduct, induces the commission of an error, he is estopped from asserting it as grounds for reversal. [Citations.] Similarly an appellant may waive his right to attack error by expressly or *impliedly agreeing at trial to*

17

*the ruling* or procedure objected to on appeal.' [Citations.] . . . [¶] . . . Absent unusual circumstances in spite of this risk, appellate courts generally are unwilling to second guess the tactical choices made by counsel during trial.  Thus where a deliberate trial strategy results in an outcome disappointing to the advocate, the lawyer may not use that tactical decision as the basis to claim prejudicial error." (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685-1686, italics added [jointly drafted special verdict form resulted in inconsistent verdict]; *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 567 [jointly requested legally incorrect jury instructions].)

Inquest's appeal seeks reversal of the jury's verdict based on the theory it was improperly "*precluded* from arguing that it was not subject to the Act or from taking steps to ensure that this claim was not presented to the jury." (Italics added.)  Inquest complains the court "led the jury to erroneously conclude that Inquest violated a statute that never applied to it and meant that the trial court improperly awarded treble damages to Reilly . . . .  Therefore, the judgment, as well as the award of treble damages, should be vacated."

We have reviewed the record and find Inquest never objected to application of the Act or did anything to suggest the Act did not apply.  It was never "precluded" by the trial court from arguing it was not subject to the Act because the trial court was completely unaware it was a disputed issue.  Inquest made the tactical decision to go along with the court's decision it had a duty under the Act, it made arguments before and during trial indicating it believed the parties were covered by the Act, and it submitted jury instructions permitting the jury to reach a verdict Inquest violated the Act and the violation was willful (warranting treble damages).  In short, we will not second guess the tactical choices made by counsel in this case.  After embracing and using the summary adjudication ruling regarding the Act before and after trial, Inquest waived its argument this court must overturn the pretrial ruling as a means to reverse the jury's final verdict.

18

It would be inherently unfair to allow a party to raise this issue for the first time on appeal after inviting the alleged error.

## C.  Challenges to the Jury's Verdict

Inquest insists that because the jury awarded Reilly over $2 million in damages, "we must assume the jury concluded that the September 22 document . . . reflected the parties' contract . . . [and] must also have concluded Reilly was entitled to commissions indefinitely."  Inquest contends the agreement cannot be interpreted as "creating a perpetual right to commissions" and this court, applying a de novo standard of review, should interpret the contract as terminable at will.  Inquest also cites cases for the proposition that "a contract will not be construed to call for perpetual performance unless the language of the contract unequivocally compels such construction."  (*Zimco Restaurants, Inc. v. Bartenders & Culinary Workers Union* (1958) 165 Cal.App.2d 235, 238; *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 727-728.)  Inquest's authorities, while supporting the proposition for which they are asserted, are not on point.  The agreement does not require perpetual performance.  Rather, as we will explain, the right to receive commissions was limited to profits that "resulted from" Reilly's activities.  A causal connection was required and the obligation did not necessarily last indefinitely.

We begin by restating the controlling principles of contract interpretation: "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting.  (§ 1636; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.)  When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible.  (§ 1639.)  'The words of a contract are to be understood in their ordinary and popular sense.'  (§ 1644; see also *Lloyd's Underwriters v. Craig & Rush, Inc.* (1994) 26 Cal.App.4th 1194, 1197-1198 ['We interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made'].)"

(*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 (*Founding Members*).)

"California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation]. The parties' undisclosed intent or understanding is irrelevant to contract interpretation. [Citations.]" (*Founding Members, supra,* 109 Cal.App.4th at p. 956.)

"The ultimate construction placed on the contract might call for different standards of review. When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. [Citations.] When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence. [Citations.]" (*Founding Members, supra,* 109 Cal.App.4th at pp. 955-956.)

In this case, because the interpretation of the contractual language turned on a question of the credibility of conflicting extrinsic evidence, the trial court properly realized interpretation was the jury's responsibility as the trier of fact. (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912-913.) The jury was given instructions on the above mentioned principles of contract interpretation. As will be explained, we reject Inquest's argument the jury's interpretation of the contract gave Reilly a lifetime of commission checks and his contention the jury's verdict was unsupported by the contract terms and basic principles of contract interpretation.

"We turn first to the language of the contract itself. 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' (§ 1638.)" (*Founding Members, supra,* 109 Cal.App.4th at p. 956.) Paragraph 7 stated, "It is agreed that any jobs, orders or contacts that [Reilly] brings to the company *that result in orders* being placed with the company or [Singhal's

20

or Sethia's] entities, then the profits *from those activities* will be shared equally with [Reilly]." (Italics added.) The provision clearly calls for 50 percent of the profits from all sales that are a "result" of Reilly's "activities." The agreement specified Reilly's "activities" included not only securing specific orders for merchandise but also bringing "jobs and contacts" to Inquest.

By their plain meaning, the terms "jobs, orders, and contacts" are not synonymous. The profits anticipated from a single order would reasonably be understood to be different from the ongoing long-term profits following the introduction of a new contact or job resulting in multiple orders. The duration of Reilly's commissions was limited to the time profits arose as a direct result of Reilly's activities, as opposed to when a returning customer makes an order for products due to other factors (such as customer satisfaction or product quality). The agreement simply did not create a perpetual right to commissions.

As applied to this case, Reilly had preexisting contacts with Triconex, and he used his contacts and relationships with Triconex's representatives to secure a new customer for Inquest. The agreement stated Reilly was entitled to commissions for the period of time Triconex's orders were a result of Reilly's involvement and activities in getting Triconex as a customer. After Reilly left Inquest, the business relationship between Inquest and Triconex continued to evolve and solidify. However, with the passage of more time, Triconex's orders would eventually generate independently from Reilly's earlier involvement. In recognition of this fact, Reilly only requested commissions from Triconex's orders until 2015.

We note, Inquest's arguments at trial shows it plainly understood the difference between commissions made from a specific order as opposed to long-term profits generated from the introduction of a bigger job or customer. On appeal, Inquest does not argue the terms "jobs, orders, and contacts" are synonymous or ambiguous. Rather, at trial and on appeal, Inquest makes a factual argument there was no evidence

21

Reilly was anything more than an ordinary salesperson, hired to get specific orders from Triconex and, therefore, his right to commissions ended with his separation from the company. Inquest also asserts Reilly asked for the title of vice president of business marketing simply to help him gain better access to potential customers and not because he expected a bigger stake in the company's long-term profits. In essence, Inquest's theory at trial was Reilly was not really in a position to bring in "jobs" or "contacts" for which longer-term commissions would be expected. However, this sufficiency of the evidence argument is simply not relevant to the issue of whether the jury properly interpreted the contract.

By its plain terms, the agreement created a business relationship contemplating much more than the hiring of an ordinary salesman. The agreement stated Reilly was expected to grow the company based on his experience and contacts in the business. As in a partnership, he was promised 50 percent of the profits from all the business he generated, and he was promised a greater reward in the future if things went well. Indeed, it was suggested the 50 percent commission and employment as vice president was only the starting point in the parties' business relationship. The parties anticipated the structure of the company could change if Reilly grew the business. Specifically, the document stated, "As many things could change over the next [12] months it is decided not to change the structure of the company *at this time*. [Reilly] will be employed by the company and given the title of 'Vice President of Business Development['])." (Italics added.) Additionally, the parties contemplated giving Reilly additional benefits if he was successful, stating, "A discussion needs to take place regarding what happens if the company becomes very successful as a result of [Reilly's] activities. This discussion will determine how [Reilly] can be adequately rewarded if such an event occurs." The jury properly interpreted the contract as providing a commission for not only simple one-time orders, but also for profits generated by longer term jobs and ongoing renewable orders from new customers.

22

Finally, we note the jury's award of approximately $2 million, contrary to Inquest's argument, was not based on an interpretation giving Reilly commissions indefinitely for the rest of his life. Reilly's expert, Thomas Neches, calculated Inquest owed Reilly $2,063,702 based on a formula incorporating profits generated from sales to Triconex/Invensys from 2007 to 2015. He analyzed checks, printouts from accounting software, purchase orders, invoices, and quotes to determine the sales generated each year from 2007 to May 2011. Based on this historical data, Neches conservatively estimated what the sales would be each year from 2011 to 2015. From these sales figures, he then calculated a 27.5 percent profit margin and determined Reilly was entitled to half of that amount. When asked why he stopped at 2015, Neches explained, "I don't really expect that the sales will simply vanish starting in 2016[] [b]ut the further away you get in the future, the more uncertain it becomes. And simply[,] to be simple and conservative[,] and because it's commonly done that you'll project about five years, I stopped it at 2015. [¶] In fact, the amount owed [to] . . . Reilly is understated." Moreover, it was reasonable for the jury to conclude Inquest understood its sales would grow significantly if Reilly could bring in Triconex as a customer, because it offered to pay 50 percent of the profits to reward the growth in the business. We conclude the jury's interpretation of the agreement and its award of damages is well supported by the record.

Alternatively, Inquest challenges the jury's verdict by arguing Reilly failed to introduce extrinsic evidence to support a contract interpretation establishing Reilly would receive commissions for the rest of his life. This argument fails for two reasons. First, as stated above, the jury did not award damages based on a lifetime of commissions. Second, extrinsic evidence is not relevant when the contract appears unambiguous on its face. (See *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.) As noted earlier, Inquest does not contend the terms are

23

ambiguous.  Thus, Reilly had no burden to produce extrinsic evidence to establish what was plainly and expressly written in the agreement.

Within Inquest's argument about the lack of extrinsic evidence, it also disputed whether Reilly's evidence supports the jury's verdict regarding the contract. Specifically, it notes evidence of Reilly's subjective intent in drafting the contract, and Inquest's payment of $1,500 after Reilly severed ties with Inquest, do not support an interpretation Reilly was to receive commissions for the rest of his life.  Inquest explains there are other facts such as the "final settlement" notation on the final commission check, which refute Reilly's interpretation of the contract.  As noted above, such extrinsic evidence is irrelevant because the contract terms appear unambiguous.  And contrary to Inquest's contention on appeal, we have no reason to speculate the jury relied on this evidence instead of the plain language of the contract when determining the meaning of its terms.  After all, the jury was instructed, "You should assume that the parties intended the words in their contract to have their usual and ordinary meaning . . ." and in deciding the meaning of the words "you should consider the whole contract, not just isolated parts."  The jury was also instructed it was their duty to decide the case based on the instructions of law the court provided.  There is nothing in the record suggesting the jury did not follow the instructions as given.

*D.  Breach of Contract*

Inquest asserts there was insufficient evidence to support the jury's finding it breached the contract.  Specifically, it claims there was insufficient evidence Reilly was "[r]esponsible for [i]ntroducing Triconex to Inquest."  In addition, Inquest maintains Reilly should not "be credited for future orders for which he had no involvement." Inquest contends it did not breach the contract by failing to pay commissions on profits generated from sales to Triconex because there was insufficient evidence Reilly's activities resulted in these sales.  However, in raising a sufficiency of the evidence claim on appeal, Inquest merely reargues the evidence favorable to its theory of the case, citing

24

to evidence and drawing inferences showing: (1) Inquest already had a business relationship with Triconex before Reilly started working for Inquest; (2) Triconex was not Reilly's contact; (3) Reilly's action of reintroducing Triconex should not be the basis for commissions; and (4) Reilly did not have any role in sales to Triconex for the years 2007 to 2015.

Because Inquest does not discuss the evidence supporting the jury's verdict, its argument does not amount to anything more than inviting us to redecide the case. This is not our standard of review. "Where there is conflicting evidence, or evidence susceptible of conflicting inferences, the general rule is not to disturb the judgment. All presumptions are in favor of the judgment. Trial judges and juries are the exclusive judges of credibility and may disbelieve any witness. . . . [¶] . . . On appeal, the evidence is considered in the light most favorable to respondent, giving the benefit of every reasonable inference, and resolving all conflicts in support of the judgment. [Citation.]" (*Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 412-413.)

Based on our review of the record, we conclude Reilly presented ample evidence Triconex qualified as a new "contact" deserving of a commission. Reilly testified he told Inquest one of the potential customers he would introduce to grow the business was through his contacts with Triconex. There was no evidence Triconex was purchasing products from Inquest before Reilly started working for them. To the contrary, the agreement stated Reilly would not receive commissions from orders originating from the Web site for any "*existing customer* that has been identified by [Singhal or Sethia] prior to the inquiry, to be outside this agreement." (Italics added.) Reilly testified no one identified Triconex as a preexisting customer. And Singhal admitted Inquest did not have a vendor number with Triconex before Reilly agreed to help grow the business. Robert Rasmussen, a general manager at Triconex, testified the company approves vendors for specific parts only. He explained the vendor approval process was necessary before Triconex could place an order with Inquest. Rasmussen

25

recalled Reilly contacted him in 2003, and stated he was representing Inquest and he wanted to "introduce them as a potential supplier of some of [Triconex's] key components, primarily sheet metal related, from sources in Asia." He opined Reilly was instrumental in getting Inquest approved as a Triconex vendor.

Reilly testified he contacted Triconex on behalf of Inquest, and worked to get Triconex's product specifications, price quotes, and the necessary vendor approvals. Once Reilly succeeded in getting a vendor number for Inquest, Triconex began making orders. The parties understood the relationship between Inquest and Triconex was "evergreen," meaning Triconex gave vendors an "ongoing business relationship" and vendors could expect orders would be regularly renewed. The jury could reasonably infer from Inquest's payment of commissions on the initial orders that Triconex qualified as a "contact" under the terms of its agreement with Reilly. Based on all the above, we conclude there was substantial evidence Triconex was Reilly's "contact" and Inquest's failure to pay commissions arising from Triconex's orders was a breach of contract.

Inquest also complains there was insufficient evidence Reilly should be credited for Triconex's orders from 2007 to 2015. It asserts there was no evidence Reilly had any role in sales to Triconex after Inquest terminated its relationship with Reilly in 2007. This argument is based on the faulty premise Inquest's duty to pay commissions was limited to specific orders. As explained in more detail earlier in this opinion, the commission provisions are broadly worded to awarded 50 percent of the profits for more than just specific orders. The agreement also provided for longer-term commissions arising from "contacts" Reilly brought to the company that resulted in bigger jobs and evergreen orders. The jury could reasonably rely on Reilly's expert's calculations of commissions ending in the year 2015. When asked why he stopped at 2015, Neches explained, "I don't really expect that the sales will simply vanish starting in 2016[] [b]ut the further away you get in the future, the more uncertain it becomes. And simply to be simple and conservative and because it's commonly done that you'll project about five

years, I stopped it at 2015. [¶] In fact, the amount owed [to] . . . Reilly is understated." Based on the expert testimony and supporting evidence, we find no grounds to disturb the judgment.

E. *Other Claims*

Inquest attacks Reilly's remaining causes of action based on the assumption this court would rule in its favor and conclude (1) the court erred and Inquest was not subject to the Act, and (2) the jury erred and Inquest did not breach the contract. However, we have concluded the court and the jury were right. The jury entered a general verdict in favor of Reilly and awarded damages consistent with the evidence and instructions submitted on the contract claims. There is no need to address Reilly's other causes of action. The judgment may be affirmed based on breach of contract liability.

F. *The Damage Award*

Inquest asserts there was insufficient evidence to support the jury's damage award because it was erroneous for the jury to rely on Neches's calculations, which included profits from not only Triconex, but also Reynosa and T&T. Without providing citations to the record, Inquest describes Reynosa as a division of Invensys and T&T as Triconex's subcontractor. It concludes Reilly had no role in bringing T&T to Inquest and therefore sales to T&T should not have been included in Neches's calculations.

It is true that Neches written report includes profits from sales to Reynosa and T&T (Exhibit 147, Schedule 1). Neches testified he compiled the data from checks and accounting software printouts. Neches stated the first column his report (Schedule 1), "shows which division of Triconex the sale was to, Triconex, T&T, Reynosa." This shows the expert determined T&T was similar in status to Reynosa and both divisions should be included in the calculations. Inquest does not cite to any portion of the record refuting the expert's conclusion and characterization of T&T. We need not independently hunt for contrary evidence in the record. The jury properly considered

27

Neches's calculations that took into account profits arising from sales to Triconex, T&T, and Reynosa.

III

The judgment is affirmed.  Respondent shall recover his costs on appeal. Respondent's motion to strike portions of appellant's appendix is denied.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


IKOLA, J.