Filed 2/6/14  Kim v. Lim, Ruger & Kim CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| SEONGSU "JAMES" KIM et al., | B240378, B243162 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC453065) |
| v. | |
| LIM, RUGER & KIM, | |
| Defendant and Respondent. | |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge.  Affirmed.

Law Office of Chad Biggins and Chad Biggins for Plaintiffs and Appellants.

Kaufman Dolowich Voluck & Gonzo, Frances M. O'Meara, Stephen M. Caine, and Holly M. Teel; Horvitz & Levy and Lisa Perrochet for Defendant and Respondent.

Appellants Seongsu "James" Kim and his wife Eun Kyung Kim (collectively "the Kims") appeal from an adverse judgment in their malpractice action against their former law firm, respondent Lim, Ruger & Kim (Lim Ruger). They challenge the trial court's finding that a release signed by the Kims in an action brought by their lender applied to release Lim Ruger in this action. They also challenge the court's award of attorney fees to Lim Ruger.

We conclude the terms of the release clause of the settlement agreement unambiguously apply to Lim Ruger, and the admissible extrinsic evidence cited by the Kims does not raise an ambiguity as to the meaning of the release. Our independent review of the language of the release supports our conclusion that the parties' objective intent was to include Lim Ruger in the release as attorneys for the bank. The release is not reasonably susceptible to the Kims' interpretation, which would limit its scope to attorneys who represented the bank at the time the release was negotiated. Judgment based on the release was proper.

The Kims also appeal from an order granting Lim Ruger $230,803 in attorney fees as the prevailing party. We find no basis to reverse the fee award.

## FACTUAL AND PROCEDURAL SUMMARY

We take some of the factual and procedural summary from the unpublished opinion by Division Two of this district in the related case, *Kim v. Superior Court* (Jan. 11, 2010, B219354), which we discuss below.

In 2007, the Kims retained Lim Ruger to perform estate planning services, including the creation of three trusts. Youngsun Park and Jeanette Hahm of Lim Ruger performed that work. Shortly after it was completed, these two attorneys left Lim Ruger.

In 2009, Wilshire State Bank (the bank) sued the Kims to enforce personal guarantees they had executed for several loans made by the bank to the Kims and their businesses. (We refer to this as the guaranty action.) The loans totaled $12.5 million and were in default. The bank alleged that one of the trusts created by Lim Ruger had executed a deed of trust in favor of the bank, pledging the Kims' family home as security

2

for the note.  The bank sought:  appointment of a receiver to take possession of all assets of one Kim company, a court order for sale of those assets, foreclosure on the Kims' home, and an order finding Mr. Kim personally liable for any deficiencies.

Lim Ruger was retained by the bank to represent it in the guaranty action.  Codette Wallace, senior legal counsel for the bank, testified that Lim Ruger had acted as counsel for the bank on various matters since she was hired in March or April 2010.  It remained on the bank's list of outside counsel at time of trial.  Joanne Kim, president of the bank, retained Lim Ruger to represent it in the guaranty action.  Lim Ruger had provided legal services to the bank on other matters as well.

The two Lim Ruger attorneys who had performed the estate work for the Kims had left the firm, and a conflicts check did not reveal the conflict of interest.  Christopher Caldwell, counsel for the Kims, notified Lim Ruger of the conflict.  Lim Ruger took the position that there was no disqualifying conflict.  The Kims' motion to disqualify Lim Ruger was denied by the trial court.  The Kims brought a petition for writ of mandate challenging that ruling.  This court issued a stay and an alternative writ in October 2009. On January 22, 2010, Division Two of this court issued its unpublished opinion granting the Kims' writ on the ground that Lim Ruger had undertaken the successive representation of clients with adverse interests.  Lim Ruger was disqualified.

The bank then retained Luce Forward to represent it in the ongoing guaranty action.  David Krause-Leemon handled that case for the firm.  A mediation was conducted in the spring or early summer of 2010.  Settlement negotiations continued until shortly before the settlement agreement was signed, sometimes with the participation of the mediator.  Before the mediation began, counsel for the Kims invited Lim Ruger to participate in the mediation in light of the potential claims of both the Kims and the bank against Lim Ruger.  It did not participate.

In September 2010, the parties reached a settlement.  It was memorialized in a detailed agreement and mutual release (the agreement).  The parties were identified as the

3

bank on one side,[1] and on the other, Mr. Kim's business entities[2] and Mr. and Mrs. Kim individually, and as trustees of the Kim Family Trust (collectively referred to as the "'Kim Parties'"). The agreement detailed the many loans and lines of credit extended to the Kim Parties by the bank and its predecessor, Mirae Bank.

The release given by the Kims states: "The Kim Parties and [Mrs. Kim], on behalf of themselves and their agents, employees, attorneys, officers, directors, predecessors, successors, affiliates, subsidiaries and assignees hereby fully and forever release and discharge Wilshire [bank], and *each of its* agents, employees, *attorneys*, officers directors, predecessors, successors, affiliates, subsidiaries and assignees, from any and all claims, actions, causes of action, demands, indemnity, suits, debts, sums accounts, controversies, rights, damages, awards, costs, attorneys' fees, losses, expenses and *liabilities* whatsoever (contingent, accrued, matured, direct, derivative, personal, individual, collective, assigned, *discovered, undiscovered, known, unknown, inchoate or otherwise*) in connection with, relating to, or arising out of the [specified loans] and the Action or that could have been asserted in the Action, including, without limitation, any claims for sanctions, contempt *or any other remedies arising from or related to the Action*." (Italics added.) We discuss the details of this provision and others below.

In January 2011, the Kims filed the present action against Lim Ruger (the malpractice action). They alleged causes of action for breach of contract, breach of fiduciary duty, and negligence. The gravamen of the complaint was that the Kims incurred attorneys fees related to the disqualification of Lim Ruger in the guaranty action. In its answer to the malpractice complaint, Lim Ruger raised the release entered into in the guaranty action as an affirmative defense.

---

[1] The bank entered into the agreement on its own behalf and as successor to Mirae Bank.

[2] The entities were identified as: Unicorp Beef, Inc., Viteck International Corporation, and Monfort Korea Beef, Inc.

4

The trial court (Judge Susan Bryant-Deason) denied a motion for summary judgment brought by Lim Ruger on the affirmative defense of the release. It found a triable issue of material fact as to whether the parties to the agreement intended to include Lim Ruger in the release.

Trial commenced before a different judge (J. Stephen Czuleger). At the outset, the court identified the issue as whether the term "attorneys" in the release was limited to attorneys for the bank at the time the settlement was reached (Luce Forward), or extended to former attorneys on the matter, which included Lim Ruger. The court noted that there was an issue as to whether parol evidence was admissible to interpret the term. It concluded that a hearing would be held at which the court would provisionally hear parol evidence on the issue under Evidence Code section 402 (402 hearing) to determine if there was a real dispute over the meaning of the language, and whether this evidence should be admitted and considered in interpreting the settlement agreement. Both the Kims and Lim Ruger filed written briefs on the release issue, which were read and considered by the trial court.

Counsel for the bank advised the court of the confidentiality provision of the agreement, paragraph 4.6, which prohibited the parties from disclosing "the negotiations relating to this agreement to any person except the parties' tax preparers, to the parties' current and future legal counsel as may be compelled by court order or subpoena." The court ruled the mediation privilege barred introduction of evidence about the mediation.

At the 402 hearing, Lim Ruger presented testimony of Codette Wallace, senior legal counsel for the bank; Joanne Kim, president and CEO of the bank; David Krause-Leemon, counsel for the bank in the guaranty action; and Bryan Sheldon, a partner in Lim Ruger. The Kims presented the testimony of Christopher Caldwell, counsel for the Kims in the guaranty action and Mr. Kim. The court admitted trial exhibits, including emails between various witnesses after the settlement was reached. We address the evidence in detail below.

At the close of the evidence, the court described the issue as whether there was an ambiguity as to whether Lim Ruger was covered by the release. It explained: "We have

5

conducted a hearing to determine whether or not the contract is clear on its face. It was brought to my attention that there was certain subjective intents by the . . . parties that were unexpressed that would not be admissible evidence. However, there were some discussions which may cast light on what the intent of the parties were. For that reason, I conducted this hearing and took all of the testimony." The court concluded that Mr. Kim subjectively believed that Lim Ruger was not covered, while the bank "subjectively" believed that it was. The court ruled that "[b]oth of those opinions are of no evidentiary value."

The court looked at the actions of the parties to determine whether there was evidence of ambiguity, and concluded there was none. "The release is clear on its face." "There should be no evidence offered which is admissible to establish an intent other than that, which is clear from the language that I read just a moment ago. Lim, Ruger was the bank's attorneys prior to this lawsuit, was the bank's lawyer during a portion of this lawsuit, and was the bank's attorneys after the lawsuit. [¶] That being true, when the parties enter a release which says, in part, that Mr. Kim is releasing the bank's attorneys, Mr. Kim is agreeing to release Lim, Ruger. No other part of the release conflicts with that clear language."

The court addressed the carve-out language for Mr. Kim's debtors in paragraph 4.9 of the agreement. It cited evidence that Mr. Kim had debtors he wanted to collect against, and which the bank wanted him to collect against because it wanted payment under the terms of the agreement. The court found that Lim Ruger was "not a debtor as described by paragraph 4.9 because it makes no sense to say that they had intended to carve out Lim Ruger as a debtor. It is consistent with what was intended by the party, that is, to collect debts owed to the bank by collecting debts owed to Mr. Kim."

The court did not find evidence of an intent to exclude Lim Ruger in the conversations Mr. Kim testified he had with Krause-Leemon about finding him a malpractice attorney to sue Lim Ruger. The court observed that Krause-Leemon did not provide the name of an attorney to Mr. Kim. It also found that as an attorney for the bank, Krause-Leemon "would do anything, and would assist in any way if Mr. Kim had

6

the ability to collect more money so that he could pay his debt to the bank." The court found "that this release is a complete defense to the . . . three causes of action."

The court strongly encouraged counsel to discuss settlement. Alternatively, they were to "come up with a vehicle so that we don't spend any more of your clients' time and money." After a recess, the court stated that Lim Ruger would move to bifurcate the trial so as to try the affirmative defense of the release first. "The parties will stipulate that the 402 hearing, which we've done that last two days, would become the evidence in the case as to the bifurcated affirmative defense of release." The parties would move their exhibits into evidence, and then each side would be allowed to offer any additional evidence it deemed appropriate. Counsel for the plaintiffs objected to bifurcating and trying the affirmative defense first.[3]

The court deemed the 402 hearing, including the testimony and argument heard after the hearing, to be the trial on the merits of the bifurcated affirmative defense as to the release. The court "reincorporate[d] by reference its earlier comments made in ruling that the contract of release is clear on its face, that no parol evidence is necessary. What evidence was taken was taken to determine if additional evidence was necessary or raised any ambiguity. The court finds there is no ambiguity. [¶] The release on its face succeeds, and a special defense of release, therefore, overcomes the plaintiffs' action. [¶] Judgment is entered in favor of the defense."

Lim Ruger was directed to prepare a proposed judgment. An amended judgment in favor of Lim Ruger was entered. The Kims' filed a timely appeal from the judgment.

Lim Ruger moved for an award of attorney fees as the prevailing party. The motion asserted two bases for the award. The first was that the Kims had alleged in their malpractice action that they had a written retainer agreement with Lim Ruger, with a fee clause, and had sought fees in their prayer for relief. Based on this, Lim Ruger sought

---

[3] The court allowed counsel for the Kims to recall Sheldon of Lim Ruger. Over a relevance objection by Lim Ruger, he was examined about the conflict procedures in place at the firm in 2007. The court ultimately struck this testimony as not probative on the meaning of the release.

reciprocal fees under Civil Code section 1717. Alternatively, it sought the fees under the fee clause as a third party beneficiary of the guaranty action settlement agreement. The motion was supported by a declaration of Frances O'Meara, one of the attorneys principally responsible for representing Lim Ruger in the malpractice action.[4] The Kims opposed the motion, arguing Lim Ruger failed to provide support for its fee request, that Lim Ruger was not entitled to fees under the guaranty action settlement agreement, and that they prevailed in their claim against Lim Ruger for breach of contract in light of the writ issued by Division Two of this district disqualifying that firm from the guaranty action.

The trial court took judicial notice of the settlement agreement in the guaranty action, documents filed in the malpractice action, a form retainer agreement produced by Lim Ruger, and the Division Two opinion (*Kim v. Superior Court*, *supra*, B219354) granting a writ of mandate to disqualify Lim Ruger from the guaranty action. The court declared Lim Ruger to be the prevailing party. It awarded $229,803 in fees. At the hearing on the fee motion, the court declined repeated efforts by counsel to specify whether fees were awarded under the alleged fee agreement between the Kims and Lim Ruger, or under the settlement agreement in the guaranty action. It reduced Lim Ruger's request for an additional $1,997.50 in fees in connection with the fee motion to $1,000. Fees in the total amount of $230,803 were awarded. The Kims' motion to tax costs was granted in part and expert witness fees and deposition costs were reduced in the amount of $610.85. The Kims filed a timely appeal from the fee award.

## DISCUSSION

### I

We apply general rules of contract interpretation in determining the intent of the parties in reaching a settlement agreement. (*Khavarian Enterprises, Inc. v. Commline,*

---

[4] The Kims' appendix does not include exhibits to O'Meara's declaration, including discovery propounded by both parties and responses regarding the fee agreement.

8

*Inc.* (2013) 216 Cal.App.4th 310, 318 (*Khavarian*).) In doing so, we give effect to the objective intent of the parties when they entered into the contract. (*Ibid.*)

"The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473–474; see also *People v. Shelton* (2006) 37 Cal.4th 759, 767.)

"'The parties' undisclosed intent or understanding is irrelevant to contract interpretation. [Citations.]' [Citation.]" (*Reilly v. Inquest Technology, Inc.* (2013) 218 Cal.App.4th 536, 554.) Therefore a conflict in irrelevant subjective intent evidence is not competent extrinsic evidence. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3 (*Winet*).)

A. *No Parol Evidence Required*

Where we need not resort to extrinsic evidence in interpreting the settlement agreement, our review is de novo. (*Khavarian*, *supra*, 216 Cal.App.4th at p. 318.)

B. *Whether to Admit Parol Evidence*

If a written instrument is ambiguous, parol evidence may be admitted to construe language. (*Winet*, *supra*, 4 Cal.App.4th at p. 1165.) "The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.)" (*Ibid.*)

"The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation

urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.]" (*Winet*, *supra*, 4 Cal.App.4th at p. 1165.)

"Different standards of appellate review may be applicable to each of these two steps, depending upon the context in which an issue arises. The trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus the threshold determination of ambiguity is subject to independent review. [Citation.]" (*Winet*, *supra*, 4 Cal.App.4th at p. 1165.) "The second step—the ultimate construction placed upon the ambiguous language—may call for differing standards of review, depending upon the parol evidence used to construe the contract. When the competent parol evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence. (*Stratton v. First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1084.) However, when no parol evidence is introduced (requiring construction of the instrument solely based on its own language) or when the competent parol evidence is not conflicting, construction of the instrument is a question of law, and the appellate court will independently construe the writing. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)" (*Id*. at pp. 1165–1166.)

II

At the 402 hearing, Wallace, in-house counsel for the bank, stated that her client would not waive either the mediation privilege or the confidentiality provision of the agreement in this proceeding. The impact was to circumscribe the admissible extrinsic evidence of the parties' intent in entering into the release. On appeal, the Kims do not contend that the mediation privilege was improperly applied. We briefly examine the mediation privilege because of its impact on the evidence regarding the intent of the parties here.

"In order to encourage the candor necessary to a successful mediation, the Legislature has broadly provided for the confidentiality of things spoken or written in connection with a mediation proceeding. With specified statutory exceptions, neither

10

'evidence of anything said,' nor any 'writing,' is discoverable or admissible 'in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which . . . testimony can be compelled to be given,' if the statement was made, or the writing was prepared, "for the purpose of, in the course of, or pursuant to, a mediation . . . .' (Evid. Code, § 1119, subds. (a), (b).)  'All communications, negotiations, or settlement discussions by and between participants in the course of a mediation . . . shall remain confidential.'  (*Id.*, subd. (c).)  We have repeatedly said that these confidentiality provisions are clear and absolute.  Except in rare circumstances, they must be strictly applied and do not permit judicially crafted exceptions or limitations, even where competing public policies may be affected.  [Citations.]"  (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 117, fn. omitted.)

Under this privilege, the parties cannot present extrinsic evidence concerning discussions or negotiations regarding the intent of the parties about the terms of the release clause of the agreement.

### III

The Kims argue the trial court erred in concluding that Lim Ruger was a third-party beneficiary of the release, entitled to judgment in the malpractice action on that basis.  They argue the trial court applied the wrong burden of proof regarding interpretation of the agreement.  They also contend the trial court erred in concluding that the term "attorneys" in the release was unambiguous so that extrinsic evidence was not required for its interpretation.  We first address the burden of proof issue.

In *Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020 (*Rodriguez*), the Court of Appeal held that a third party invoking a release was not required to prove an actual intent to benefit him or her where the release expressly and unambiguously grants rights to a class including the third party.  (*Id.* at p. 1031.)  It concluded the language of the release itself was sufficient proof of the intent of the parties.  (*Ibid.*)  The *Rodriguez* court also did not accept the argument that the rights of a third party cannot be determined without considering the circumstances of the negotiations between the parties to the release.  (*Id.* at p. 1030.)

11

The *Rodriguez* court strongly disagreed with the contrary approach in two earlier cases: *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337 (*Neverkovec*) and its progeny, *Vahle v. Barwick* (2001) 93 Cal.App.4th 1323 (*Vahle*), decisions upon which the Kims heavily rely. *Neverkovec* held a third party seeking the benefit of a release "bears the burden of proving that the promise he seeks to enforce was actually made to him personally or to a class of which he is a member. [Citations.]" (*Neverkovec* at pp. 348–349, fn. omitted.) It concluded the third party could not rely on a literal application of the terms of the release, and was required instead to provide affirmative evidence of the intent of the parties to benefit him or her. (*Id*. at p. 349.) In addition, over the opposing view of a concurring justice, the majority ruled that evidence of the undisclosed intentions of the parties was properly admitted to explain the circumstances surrounding the negotiation of the release. (*Id*. at p. 351, fn. 9; see *id.* at p. 355 (conc. opn. of Walker, J.).) In *Vahle*, the court followed *Neverkovec* and held that a third party invoking a release could not rely on the express terms of the release, and instead had to prove that the settling parties intended to benefit her. (*Id*. at p. 1332.)

We conclude that if the release is not ambiguous, as the trial court found, the principles announced in *Rodriguez, supra,* 212 Cal.App.4th 1020 provide the better approach consistent with the principles of contract interpretation. Contrary to the argument made by the Kims, in such a situation, Lim Ruger was not required to provide affirmative extrinsic evidence that the bank and the Kims intended to benefit it through the release. We turn to the Kims' argument that the term "attorney" in the release was in fact ambiguous, so that it was for a jury to resolve conflicting extrinsic evidence as to intent.

IV

The Kims argue the term "attorney" in the release is ambiguous as to whether it is limited to the bank's present counsel, or included former counsel Lim Ruger.

12

*A. Terms of the Agreement*

The Kims argue that Lim Ruger, having been disqualified, was no longer the bank's "attorneys."[5] The Kims cite the confidentiality provision of the agreement ([¶] 4.6) which specifies that its terms may be disclosed to the settling parties' "current or future legal counsel." From this, they argue that if Lim Ruger was an intended beneficiary of the release, it would not make sense to prohibit it from knowing about its terms under the confidentiality clause.

The Kims also argue that paragraph 4.9 of the agreement evidences an intent not to benefit Lim Ruger. Identified by the parties at trial as a "carve-out" provision, this paragraph provides: "This Agreement shall inure to the benefit of the Parties and their respective . . . attorneys; provided, however, that this Agreement shall not inure to the benefit of any of the Kim Parties' debtors." The Kims contend that in light of their claim for malpractice, Lim Ruger was one of their "debtors".

We disagree with the Kim's interpretation of this clause. Paragraph 2.5 of the agreement sets out extensive provisions for the assignment and collection of accounts receivable owed to the Kim parties. The entities owing the accounts receivable are repeatedly referred to as "debtors" of the Kim parties. Construing paragraph 4.9 together with paragraph 2.5, as we must (see *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 70–71), we conclude that the reference to "debtor" in paragraph 4.9 refers to those who owed accounts receivable. There is no argument that Lim Ruger comes within that category.

---

[5] We reject the Kim's suggestion that Lim Ruger never was counsel for the bank in light of its disqualification. The Kims cite authority for the proposition that an attorney who has violated ethical duties may not collect a fee for services rendered. From this, they assert: "It logically follows that Lim Ruger was not the Bank's 'attorneys' even while it was technically counsel of record, as the representation was ineffective and in violation of the firm's ethical obligations to its former clients, the Kims." It does not logically follow. In fact, Lim Ruger was former counsel for the bank—that is why a proceeding to remove it as such was brought.

13

## B. Trial Court's Language

The Kims attack the trial court's reasoning, in particular, its statement that the release clause was "boilerplate language to cover everybody. And as we know, when these boilerplate languages are created, the 'everybody' they most want to protect are the lawyers because the lawyers are the ones drafting it."

Our review is de novo. We are not dependent on the trial court's rationale since we conclude the release is not ambiguous, as we next explain.

## C. Parol Evidence Proffered by the Kims

The Kims argue the evidence they proffered demonstrates that the release is reasonably susceptible to the interpretation that it was not intended to benefit Lim Ruger. They argue that conflicting extrinsic evidence raised an ambiguity about the meaning of the release, which must be resolved by the jury rather than the trial court as a matter of law.[6] The Kims argue the trial court foreclosed the full presentation of the evidence to a jury because it concluded that "boilerplate" language unambiguously released Lim Ruger as a matter of law. As we have discussed, if the release is not ambiguous, its interpretation is a question of law for the trial court.

### 1. Pre-Mediation Evidence

The Kims cite trial testimony that Lim Ruger was not involved in the settlement negotiations and did not sign the release. They also cite testimony by Caldwell, their attorney in the guaranty action, and by Krause-Leemon, counsel for the bank in that action, that they were aware of Mr. Kim's potential claim against Lim Ruger before the mediation. Caldwell testified that he invited Lim Ruger to participate in the mediation because he knew of the Kims' claim, and that the bank might have a claim for fees as

---

[6] The Kims argue the ambiguity of the release is confirmed by the reasoning and decision of the trial court judge who denied Lim Ruger's motion for summary judgment. They assert that the summary judgment decision was based on "much the same evidence as presented at trial." The denial of a summary judgment motion is not a basis to reverse a judgment entered after trial on the merits. (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833–834.)

well because of the conflict.  He wanted to involve as many contributors as possible in the settlement negotiation.

Since Lim Ruger did not participate in the mediation or otherwise participate in the settlement, the Kims argue that we may infer that no global settlement was reached.  But this argument is speculative.  In light of the mediation privilege, there is no admissible evidence of any discussion about claims against Lim Ruger during the mediation, and whether they were released.

Similarly, the Kims argue that since the bank knew the Kims were contemplating a malpractice claim against Lim Ruger, "the fact that Lim Ruger is not specifically released suggests that the Release does not cover the malpractice claims."  We agree with the trial court that the omission of "carve out" language preserving the malpractice action may be understood to express an intent to include Lim Ruger in the release.

### 2. *Post-Mediation Evidence*

The Kims cite evidence of several events that occurred after the mediation as demonstrating that the parties did not intend their release to cover Lim Ruger.

#### a. *Krause-Leemon and Mr. Kim's Discussion of Claim*

After the settlement agreement was signed, Mr. Kim communicated directly with Krause-Leemon, counsel for the bank, as they worked to collect accounts receivable in order to satisfy the payment terms of the settlement.  Krause-Leemon was asked:  "And isn't it fair to say that it's true that you told [Mr. Kim] the bank ought to make a claim as well against Lim, Ruger for the fees that it paid Lim, Ruger?"  He said he did not recall making that statement.  He did recall a conversation about whether Mr. Kim should pursue a claim against Lim Ruger, but he did not recall what he said.  Counsel for the Kims asked:  "Well, you didn't tell him, well, you can't sue them because you already released them, did you?"  Krause-Leemon answered:  "No.  I wasn't—in the business of giving advice to Mr. Kim.  He was the opposing party.  He was working with us to collect on the accounts receivable of Unicorp that were assigned to the bank in the settlement agreement."

The Kims argue the trial court failed to recognize that this testimony raised an ambiguity about the scope of the release. The court observed that since Krause-Leemon did not provide a referral to a malpractice attorney, "this might have been a casual conversation." It concluded that since Krause-Leemon was counsel for the bank, he would act in its interests by assisting Mr. Kim in collecting more money to pay his obligations. The court found that motivation consistent "with Mr. Krause-Leemon's efforts on behalf of his client, the bank." It made no other statement regarding this extrinsic evidence. The Kims argue the court erred in weighing the testimony and in speculating about the intent of the witnesses because the jury must make special findings resolving any conflicting extrinsic evidence.

### b. *Krause-Leemon Referral of Malpractice Attorney*

Mr. Kim testified that during his conversation with Krause-Leemon about the accounts receivable, he said he needed a good malpractice attorney. According to Mr. Kim, Krause-Leemon "told me that he will look for a couple good malpractice lawyers for me. And whenever I went to meet with him and his associate to get the lawsuit against the accounts receivable of Dream Foods, we also talked about [how] to get [a] malpractice lawyer. And I asked him by e-mail, also, to get the contact number for the malpractice lawyer. And he told me that he's going to give [it to] me later."

The email to which Mr. Kim referred is trial exhibit 18. The email string includes an email from Mr. Kim to Krause-Leemon on January 5, 2011 listing three matters that needed to be accomplished regarding the collection of accounts receivable. Later messages from Mr. Kim to Krause-Leemon ask for updates: "did you get a contact # for Malpractice lawyer?" Krause-Leemon responded: "Not yet. We are waiting for the writs to come back from the court [an item mentioned earlier by Mr. Kim] and for the court to confirm that the default [also mentioned earlier by Mr. Kim] has been entered."

Mr. Kim said that Krause-Leemon never gave him the name of a malpractice lawyer. Krause-Leemon never told Mr. Kim he could not sue Lim Ruger because the bank believed the release barred such an action.

16

Krause-Leemon was asked about this in his testimony: "But you do recall telling Mr. Kim that you'd help him find a malpractice lawyer to go after Lim, Ruger, right?" Krause-Leemon answered: "I don't think I said that either." More than once after the settlement, he told Mr. Kim that he was not Mr. Kim's attorney. He never gave Mr. Kim the name of a malpractice attorney.

### c. Discussions Between Caldwell and Krause-Leemon About Release

The Kims argue there was conflicting extrinsic evidence about "(1) whether Mr. Kruase-Leemon informed Caldwell that he agreed, as the Bank's attorney, that the Settling Parties did not intend to release Lim Ruger . . . ; and (2) whether Krause-Leemon offered to provide Mr. Kim with the name of a malpractice attorney to pursue his claims against Lim Ruger." We already have discussed the first of these. We now address the second.

Caldwell testified that after the settlement, he received a telephone call from Bryan Sheldon of Lim Ruger. Sheldon said he understood the guaranty action had been settled and that he had reason to believe that Lim Ruger was included in a release given as part of the settlement. Caldwell was upset, believing the confidentiality clause of the agreement had been breached. Sheldon said he did not know what was in the agreement. Caldwell then called Krause-Leemon and accused the bank of violating the confidentiality agreement by alerting Lim Ruger to the release. Krause-Leemon responded that he had no reason to believe the bank had breached confidentiality and he would look into the claim.

Caldwell testified: "I remember [Krause-Leemon] expressing agreement with me that—and I can't remember the exact word—but agreement with the concept that the settlement agreement was not intended to release the Lim, Ruger firm." Caldwell sent Krause-Leemon an email, and the entire email string was marked as trial exhibit 173-11. He wrote: "David: To follow up on our call yesterday, I am writing to ask that you send me a letter as follows: 'As counsel for Wilshire State Bank who was involved in the negotiation and execution of the settlement agreement between James Kim and the Bank, I can confirm that there is no provision of that agreement in which Mr. Kim releases or

17

waives his claims against any of his lawyers, including the law firm of Lim, Ruger & Kim ('LRK'). The Settlement Agreement contains a confidentiality clause and the Bank would oppose any effort by LRK to obtain access to the document.' [¶] I would appreciate receiving this letter as soon as possible, so that I can attempt to mitigate the damage caused by the Bank's apparent breach of the settlement's confidentiality clause by providing inaccurate information to LRK."

Krause-Leemon responded to Caldwell and his partner, Sandra Tholen as follows: "Sandy, we do not agree that the Bank has committed any breach of the confidentiality provision contained in the Settlement Agreement. The Bank has complied with the terms of the Settlement Agreement to date, including the terms governing confidentiality, and we fully expect that it will continue to comply with the terms of the agreement. *While I appreciate* [*Caldwell's*] *desire for the language requested in the letter that he proposes, I am concerned that any attempt to describe the legal effect of the release language might be perceived later as misleading. The best antidote to any perception that false information might have been conveyed is to provide the release language itself.* We see no bona fide reason not to do so. *Moreover, I do not think that a letter characterizing the release would serve any practical purpose.* As I suggested to Chris when we spoke, to the extent that the Lim Ruger attorneys believe that the Settlement Agreement contains release language that might include them, they are likely to continue to insist on seeing the full release language before engaging in any serious settlement discussions with you, no matter what is said in any letter to them. To that end, I renew my suggestion that the release paragraphs in the Settlement Agreement be provided to Lim Ruger so that you and Lim Ruger can address the language directly." (Italics added.)

Krause-Leemon testified that he did not write the letter requested by Caldwell because he did not think it appropriate. He thought Caldwell was asking him to take a position that he "didn't necessarily agree with and . . . didn't understand the reason for the position, and so, as I recall, there was more to it than what was included in the e-mail."

18

The Kims argue that Caldwell's testimony "suggests that the Kims and the Bank's mutual intent was that Lim Ruger would not be released by the Settlement Agreement." They contend the trial court failed to consider this testimony when it concluded that no ambiguity was demonstrated. The credibility of Caldwell's testimony about Krause-Leemon's statements concerning the scope of the release is, they argue, a question for the jury. But they contend it is sufficient to raise an ambiguity, requiring reversal of the judgment.

### 3. Krause-Leemon's Opinion About Scope of Release

The Kims argue the trial court erred in striking Krause-Leemon's testimony that in his objective legal opinion as an attorney, Lim Ruger was not included in the release. They contend the testimony was admissible to assist the court in understanding what Krause-Leemon meant in his email (trial exh. 173-11) by stating that the disclosure of the release to Lim Ruger was the "'best antidote' to any perception that false information might have been conveyed."

The common theme of all this post-settlement extrinsic evidence is an effort by the Kims to introduce Krause-Leemon's opinions and beliefs about whether the release covers Lim Ruger. He invoked the attorney-client privilege and refused to answer when asked the intention of the bank in entering into the settlement agreement. He gave the same response when asked whether the terms and conditions of the settlement accurately reflected the bank's intentions regarding the release.

"'[I]t is thoroughly established that experts may not give opinions on matters which are essentially within the province of the court to decide.' [Citations.]" (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 884; see also *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1083.) Opinions as to a legal conclusion are inadmissible. It is for the court to resolve the legal question of whether the release included Lim Ruger. (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444–1445.)

In *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, the State of California sought to enforce the terms of a master consent decree prohibiting the use of "cartoons"

19

in tobacco advertising. The term "cartoon" was expressly defined in the consent decree. The court addressed the inadmissibility of opinions by the tobacco company's advertising agency, employees, and an expert witness on the definition of "cartoon." It concluded that while the opinions of these individuals "may have been relevant to the issue of whether [the tobacco company's] violation of the ban on cartoons was intentional, *the interpretation of contractual language is a legal matter for the court.* [The tobacco company] *is not the arbiter of its conduct, and* '[*e*]*xpert opinion on contract interpretation is usually inadmissible*.' [Citation.]" (*Id*. at p. 51, italics added.)

For the same reasons, we conclude that the extrinsic evidence submitted by the Kims was not admissible to raise an ambiguity as to whether Lim Ruger was included in the scope of the release.

We further agree with the court's interpretation of the unambiguous release language. It is established that Lim Ruger represented the bank in the guaranty action until disqualified. Although both the Kims and the bank knew that the Kims had a potential malpractice claim against Lim Ruger, no language was included in the release or elsewhere in the settlement agreement to carve-out that malpractice claim from the release. The release language states that the Kims "discharge Wilshire *and each of its . . . attorneys . . . .*" (Italics added.) In addition, the damages sought in the malpractice action were the attorney fees incurred by the Kims in disqualifying Lim Ruger. Yet, in the release, the Kims gave up any claim to attorney fees related to the guaranty action.

We conclude the parties released Lim Ruger from liability under the terms of the release. The trial court properly granted judgment to Lim Ruger on that basis.

V

Civil Code section 1717, subdivision (a), provides in pertinent part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be

20

entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

"[T]he trial court has broad authority to determine the amount of a reasonable fee. [Citations.]" (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) The Supreme Court explained: "'The "experienced" trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong'—meaning that it abused its discretion. [Citations.]" (*Ibid.*)

## A. Basis for Fees

### 1. Alleged Fee Clause in Retainer Agreement

The Kims' malpractice complaint alleged that they entered into a written contract with Lim Ruger for the provision of estate planning services. It alleged "the written contract required [the Kims] to pay the fees requested by [Lim Ruger] in the amount of $4,000 or more. Moreover, the written contract contained an attorney's fees clause. . . ." The Kims also alleged that they were entitled to recover attorney fees incurred in the malpractice case "pursuant to the Written Contract." Their prayer for relief sought "attorneys fees pursuant to contract" on the causes of action for breach of contract and breach of fiduciary duty.

Since no written retainer agreement was produced in this action, the Kims contend that there was no adjudication that the blank form retainer agreement produced in discovery by Lim Ruger was the same as the agreement between themselves and Lim Ruger. They recognize that *Linear Technology Corp. v. Tokyo Electron, Ltd.* (2011) 200 Cal.App.4th 1527, held that where fees were sought by a plaintiff, the defendant may recover even if no contract is proven. They seek to distinguish that case because the plaintiff Linear lost its suit for breach of statutory warranty arising from contracts against the defendants, and attorney fees were awarded to the defendants. On appeal, Linear argued the defendants were not entitled to fees because there was no contract provision that allowed either side to recover fees if it prevailed in the action. (*Id.* at pp. 1534–1535.) Where a plaintiff claims a breach of a contract containing an attorney fee

21

provision, and defendant successfully asserts that no contract exists, it will have established there is no contract, and hence, no attorney fee provision. "*Nevertheless, since the plaintiff would have been entitled to attorney fees if the plaintiff had succeeded in proving there was a contract, courts have recognized a right of the defendant to recover attorney fees even if* [*the*] *defendant proves there was no contract, in order to further the purposes of Civil Code section 1717.*' [Citation.]" (*Id*. at p. 1538, italics added.) This is our case, assuming there is no contractual fee provision in the Kim-Lim Ruger contract. If there is such a clause in the agreement, Lim Ruger is entitled recover under its terms.

In *Hsu v. Abbara* (1995) 9 Cal.4th 863, 870, the Supreme Court declared "that a party is entitled to attorney fees under section 1717 'even when the party prevails on the grounds the contract is . . . unenforceable . . . if the other party would have been entitled to attorney's fees had it prevailed.' [Citations.]" Here, Lim Ruger prevailed on the ground that any claim by the Kims against it was barred by the release in the guaranty action, i.e. the alleged contract was unenforceable. Had the Kims' prevailed, they would have been entitled to fees in the malpractice action. Under these circumstances, Lim Ruger was entitled to an award of fees under Civil Code section 1717.

### 2. *Fee Clause in Guaranty Action Settlement*

The Kims also argue that Lim Ruger is not entitled to fees under the fee clause in the guaranty action settlement agreement. Paragraph 4.15 of the agreement states: "[T]he prevailing party in any action or proceeding to enforce the terms of this Agreement shall be entitled to attorneys' fees and costs incurred in bringing such enforcement action or proceeding."

The Kims cite *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, in which a fee claim was denied because the party claiming fees was not a party to the contract containing the fee clause. The clause in that case allowed fees in "'any litigation between the parties hereto to enforce any provision of this Agreement . . . .'" (*Id*. at p. 896.) The fee clause here is not so limited. It allows fees to the "prevailing party in any action . . . to enforce the terms of this Agreement . . . ." The term "party" was not expressly limited to the parties to the settlement agreement. Lim Ruger

22

prevailed by enforcing the release clause of the agreement, thus coming within the express language of the attorney fee clause.

The Kims argue that the agreement in the guaranty action was between them and the Bank, and that Lim Ruger was not a party or signatory. They contend that if the fee clause was not intended to benefit a third party beneficiary, it cannot be enforced by or against the third party.

That is not our case. Here, as we have discussed, the attorney fee clause was broadly written to provide fees to a party prevailing on an action on the contract. Had Lim Ruger lost its bid to enforce the release against the Kims, the Kims would have been entitled to seek fees from it under this broad fee clause. Since Lim Ruger prevailed, it was entitled to its fees under the settlement agreement as well.

B. *Amount of Fee Award*

The Kims argue that the amount of fees awarded was unsupported by "a single shred of evidence." They contend that Lim Ruger "failed to provide the billing statements, and failed to provide even so much as a declaration showing the basis of the claimed $229,000 in fees."

The record is otherwise. The declaration of attorney O'Meara in support of the motion for fees includes detailed information about the billing rates of each attorney for Lim Ruger, together with a chart totaling the number of hours billed and the amount billed by each person who worked on the case. She explained that the requested amounts were based upon recorded daily time entries for each timekeeper for services performed in connection with the preparation of a defense to the billing action. She summarized the experience of the primary attorneys who worked on the case for Lim Ruger, and attached copies of their biographies, which are not included in the appendix provided by the Kims. O'Meara stated that a copy of the bills would be made available to the court for in camera review on request. She declared that while the hourly billing rate of the principal attorneys for Lim Ruger was $235 an hour, Caldwell, who represented the Kims in the guaranty action, billed at $615 per hour. Invoices from Caldwell's firm were attached, although they are not in the record on appeal.

23

At the hearing, the court noted that counsel for Lim Ruger had presented redacted billing records in the amount of $229,803 after the opposition was filed. It found that these billing records justified the fee request. Counsel for the Kims objected that the billing records were filed late and that he had not had an opportunity to review them. The court responded that the additional records were filed a week before the hearing, and that it had taken the opportunity to review them. It expressed surprise that no response or request for additional time had been made by the Kims. Counsel for the Kims then asked for more time to provide one. The court offered to put the hearing over for a week and to give counsel for the Kims the weekend and Monday to prepare a supplemental response. Counsel for the Kims rejected this as insufficient. The court proceeded to rule on the merits. The supplemental billing records referred to by the court are not included in the appellant's appendix.

Thus the court had before it a detailed declaration, plus redacted billing records. This contradicts the Kim's claim that "there was no evidence, let alone competent evidence, as to the nature and value of the services rendered." It is established "that an award of attorney fees may be based on counsel's declarations, without production of detailed time records. [Citations.]" (*Raining Data Corp. V. Barrenechea* (2009) 175 Cal.App.4th 1363, 1375.)

The Kims cite footnote 4 in *PLCM Group v. Drexler*, *supra*, 22 Cal.4th at page 1096 for the proposition that detailed billing records must be submitted. But the footnote cited merely observes that counsel requesting fees had not maintained contemporaneous daily billing records and had prepared a detailed reconstruction for purposes of the fee request. Here, O'Meara explained that her firm employed time-tracking billing software to record daily time entries, just the type of contemporaneous record contemplated by the Supreme Court.

Under these circumstances, we find no abuse of the trial court's discretion in awarding $230,803 in fees. This was a complex case involving challenging evidentiary issues, a motion for summary judgment, multiple motions in limine, and a two-day trial.

24

## DISPOSITION

The judgment of the trial court and the attorney fee award is affirmed.  Lim Ruger is to have its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.


SUZUKAWA, J.