Filed 5/7/15  Ehrlich v. Zlot CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| MICHAEL EHRLICH,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>HAROLD ZLOT et al.,<br><br>        Defendants and Respondents. | A139567, A139829<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-11-516168) |

Harold Zlot was the sole owner of Access Fund Management Company (Access Management), which managed a group of investment hedge funds (The Access Fund, L.P.; hereafter Access Fund or Fund).  In 2004, Zlot asked appellant Michael Ehrlich to assist in management of the Fund, offering him half of the management fees it generated and promising him half of the proceeds from a then-anticipated sale of the company.  In late 2010 Zlot removed Ehrlich and in 2011 Access Management merged with a different entity.  Ehrlich sued Zlot and Access Management (Defendants) for a premerger share of management fees and for a share of the merger proceeds.  Ehrlich argued that he and Zlot had entered into a partnership or, in the alternative, an employment contract that entitled him to posttermination compensation in the event of a sale of Access Management.  He brought claims for breach of a partnership agreement, breach of contract and the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, promissory

1

estopel, as well as equitable causes of action.[1]  After the close of evidence, the trial court granted a directed verdict in Defendants' favor.  (Code Civ. Proc., § 630.)

We reverse in part.  Ehrlich produced substantial evidence that would support jury findings in his favor on several causes of action, and the trial court erred in excluding expert testimony Ehrlich sought to present at trial.  Because we vacate the judgment and remand for a new trial, we dismiss as moot Ehrlich's appeal from the denial of his motion to tax costs.[2]

## I.  BACKGROUND

"A motion for directed verdict, like a motion for nonsuit, is in the nature of a demurrer to the evidence.  [Citations.]"  (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 420, p. 494.)  " ' "[A] directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " [Citations.]' [Citations.]"  (*North Counties Engineering, Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902, 919.)  The power of a court in passing upon such motions is " 'strictly limited.' "  (*Estate of Lances* (1932) 216 Cal. 397, 401.)  "In determining such a motion, the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses. . . . A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is

---

[1] Ehrlich originally asserted 14 causes of action in his first amended complaint. During trial he dismissed claims for defamation, tortious interference with business relations, and intentional interference with prospective economic advantage.

[2] By order of December 26, 2013, we granted Ehrlich's motion to consolidate his appeal of the judgment (No. 139567) with his appeal of the postjudgment order (No. 139829).  On September 30, 2014, Defendants moved to strike portions of Ehrlich's reply brief, arguing that Ehrlich misrepresented the record and raised new arguments. The motion is denied.  In our view, Ehrlich's representations are supported by reasonable inferences drawn from the evidence and he did not materially alter the arguments he made in his opening brief.

2

directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629–630.) On appeal, we decide de novo "whether sufficient evidence was presented to withstand a directed verdict. [Citation.]" (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 46–47.)

We summarize the trial evidence from this required perspective.[3]

A.      *Access Fund Origin and First Republic Deal*

In about 1987, Zlot established the Access Fund—a "fund of funds" that pooled investments into a diversified set of hedge funds to achieve low volatility and favorable long-term returns. Collectively, the investments were the Fund's "assets under management." The Fund was structured as a limited partnership, with Zlot serving as general partner and the other investors as limited partners. The general partner provided investment management and administrative services to the Fund and in turn collected management fees. In 2002, Zlot created Access Management, a subchapter S corporation that he wholly owned and controlled. Access Management became the Fund's general partner.

In 2004, Zlot created Access Fund Management LLC (Access Management LLC). First Republic Bank (First Republic) acquired 24.9 percent of Access Management LLC and an option to purchase the remaining 75.1 percent by April 2009 at a multiple of 3.5 times the gross management fees (less third party referral fees) generated by the Fund's assets under management for the previous 12 months. As part of the consideration, First Republic received 8.25 percent of Access Management's gross

---

[3] While we accept Ehrlich's evidence as true for purposes of this appeal, "nothing in this opinion should be construed as proven fact for purposes of later proceedings. Such facts are properly determined by the trier of fact." (See *Kempton v. City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1347, fn. 1 [review of judgment on the pleadings].)

revenues and agreed to refer clients to the Fund.[4]  Access Management delegated its investment management and administration responsibilities to Access Management LLC, and Zlot controlled operations of both entities.[5]

B.       *Ehrlich's Move to Access Management*

In order to maximize revenue from the anticipated sale to First Republic, Zlot looked for someone who could help him build the Fund's assets under management before the 2009 option date.  In about October 2004, Zlot met Ehrlich through a mutual acquaintance.  Ehrlich had law and business degrees, state and federal securities licenses, and he had managed money for high net-worth individuals for three years at Merrill Lynch.  In several conversations, Zlot told Ehrlich "he was looking for a true partner to help build this and that it could be a very exciting opportunity.  First Republic would buy us in five years, and at that point we can either go our own way[s] or I could stay and work for First Republic running the fund.  He would be retiring."  In December 2004, Zlot agreed to Ehrlich's proposed compensation terms (the Agreement), and Ehrlich joined Access Management on January 3, 2005.  The terms of the Agreement were not memorialized until more than a year later, in a March 2006 e-mail:

"1.  $150,000 annual base salary less any extra payments made for automobile lease and insurance expenses.

"2.  Split all gross revenue on new capit[a]l invested in the [Access Management LLC] by new and existing investors from January 1, 2005[.  T]his shall be paid against

---

[4] At some point, the Access Fund established related funds, including Access Fund II, tailored to the needs of particular clients.  Insofar as the record discloses, all funds were structured similarly:  Access Management was the fund's general partner and delegated investment management and administrative duties to Access Management LLC.  Distinctions among these funds are largely immaterial to issues raised in this appeal.

[5] Although the parties frequently refer to the two entities and investment fund indiscriminately as "Access," we attempt to distinguish between them where possible.  For simplicity, we at times use "Access Management" to refer to either or both of the management companies because the distinction is not material to any issues raised in Ehrlich's complaint.  Access Management LLC was dismissed by Ehrlich pursuant to stipulation prior to trial.

the $150,000 base salary. Gross revenue is defined as total fees collected less any referral fees paid to third parties, including First Republic Securities and less the 8.25% asset fee payable to [First Republic].

"3. Zlot to pay all reasonable expenses.

"4. [First Republic] has an option to purchase the balance of [Access Management LLC]. Copy of Option Agreement attached. Option is based on a multiple of Gross Revenues. Ehrlich to receive his share of potential purchase price equal to the multiple of 50% of gross revenue, as defined above, as against the multiple paid by [First Republic]."

In addition to automobile expenses that were deducted from his $150,000 base salary, Access Management paid Ehrlich's health insurance and travel and entertainment expenses, including Golden State Warrior season tickets that cost more than $20,000 a year.[6] Every quarter, Access Management calculated Ehrlich's share of management fees, and any amounts exceeding his base salary for the quarter ($37,500) were either paid as a bonus, or at Ehrlich's election, retained in the Access Fund as a personal investment.

When the parties made their Agreement, they both expected First Republic to exercise its option in April 2009 and to then engage either Zlot or Ehrlich to help run the business. No discussion occurred as to how Ehrlich's position at Access Management might end other than by way of a sale to First Republic.

C.    *Representations about Ehrlich's Position*

During the last week of December 2004, Ehrlich sent an e-mail to his Merrill Lynch clients and other business associates stating: "I accepted an offer yesterday to join the [Access Fund] as *a full Partner*." (Italics added.) By "full Partner," Ehrlich meant he was helping run the business as an entrepreneur, in contrast to his position as an employee at Merrill Lynch, where he was a "partner on a team" that collaboratively

---

[6] Zlot agreed that Access Management would pay all of Ehrlich's "reasonable expenses up until we got to the private jet level, and that's when we would have to consider splitting expenses." Although the Fund's assets under management eventually reached a peak value of $200 million, it never came close to "private jet" level.

5

managed money for a set of individuals and shared revenues from that work. Ehrlich forwarded a copy of this e-mail (as part of an e-mail chain) to Zlot, who never voiced any objection.

When Ehrlich arrived at the Access Management office in January 2005, Zlot introduced him to Access Management's administrative assistant, investors, and others in the office as Zlot's "new partner." Zlot also introduced Ehrlich as his "co-portfolio manager" and "a principal in the firm," and Ehrlich introduced Zlot as his "business partner." Zlot never told Ehrlich not to use the titles "partner," "true partner," or "full partner."

In January 2005, Access Management issued a 2004 year-end letter signed by Zlot that stated, "I am very pleased to announce that I have a *new partner* in the Access Fund, Michael F. Ehrlich." (Italics added.) In March 2005, Access Management issued a press release entitled, "Access Fund Management Names Michael Ehrlich as *Partner*." (Italics added.) A pitch book for investors written by Ehrlich identified Ehrlich as "*President and Co-Portfolio Manager*," and "*Principal*, The Access Fund." (Italics added.) A 2006 due diligence questionnaire (prepared by Ehrlich) was provided to potential investors and described "the firm's compensation philosophy" as: "The Access Fund's senior investment professionals, Harold Zlot and Michael Ehrlich, are *partners* of the firm. Senior investment professionals are *compensated with a combination of base salary and a pre-determined percentage ownership of the firm*." (Italics added.) Ehrlich understood that he had an ownership interest in the Access Management revenue stream (i.e., the management fees). Zlot saw all of these publications and never told Ehrlich they misrepresented Ehrlich's position at the company.

D.    *Ehrlich's Duties and Compensation*

Both Zlot and Ehrlich cultivated potential investors and referral sources, and both worked on portfolio management and research. Ehrlich also upgraded the firm's technology and filing systems, research reports, due diligence questionnaires, and marketing materials. He sent out monthly communications to actual and prospective

6

investors and developed a 1,000-person distribution list.[7] Ehrlich and Zlot worked by consensus in choosing individual Fund managers, but Zlot made the final decision. Ehrlich helped make hiring decisions, but did not have the power to hire or fire employees. He could not sign Access Fund audit documents or contracts with Access Fund investors because he was not an equity owner in the Fund. Only Zlot signed and filed the tax returns for Access Management. Aside from Zlot and Ehrlich, Access Management engaged a full-time administrative assistant (later, two such assistants), a part-time employee, and a consultant.

Before Ehrlich joined Access Management, the value of Access Fund's assets under management was $64.6 million. That value grew to $85.5 million in 2005, $106 million in 2006, and $184 million by the end of 2007 (peaking earlier in the year at $200 million). The Access Fund had added 200 new investors. Ehrlich contributed to this growth.

Throughout Ehrlich's time at Access Management, his entire compensation (including both his base salary and share of management fees) was reported on W-2 tax forms, which identified him as an Access Management employee. Ehrlich earned $141,574 in 2005, $149,494 in 2006, $456,337 in 2007, and $659,789 in 2008. Until 2007 or 2008, Zlot's own compensation was reported as a "partnership distribution"[8] and no employment taxes were withheld. Beginning in 2007 or 2008, Zlot was paid $80,000 a year salary as an officer of Access Management and that salary was reported on a W-2 form with employment taxes withheld; the rest of his compensation was reported as a

---

[7] Both Ehrlich and Zlot also conducted outside business for their personal benefit that did not directly benefit the Access Fund or Access Management. Zlot was aware of at least some of the personal business conducted by Ehrlich.

[8] Access Management LLC issued K-1 "partnership" tax returns to Zlot and First Republic. Zlot's distribution from the LLC was then reported on a return for Access Management.

partnership distribution.[9] Zlot paid for his own health insurance. In 2010, Zlot earned $80,000 in salary and $263,446 in other compensation.

E. *Global Financial Crisis*

Due to the 2007–2008 financial crisis, the Access Fund's assets under management dropped by about $50 million (25 percent) by the end of 2008, and by another $15 million to $20 million by the end of 2009, ending at $111 million. Both Zlot and Ehrlich were stressed by the situation and the firm's atmosphere was tense. Zlot and Ehrlich decided to close the Access Fund's leveraged subfund. Zlot asked Ehrlich to share in the legal expense of doing so, and Ehrlich agreed to pay a share proportionate to his share of fees from that fund (about 25 percent). Zlot also asked Ehrlich to pay for more of his travel and entertainment expenses, and Ehrlich agreed to pay for the Golden State Warriors tickets and to reduce other expenses.

Meanwhile, Merrill Lynch had purchased First Republic, and Bank of America had then purchased Merrill Lynch. Zlot and Ehrlich realized that First Republic would no longer exercise its option because both Bank of America and Merrill Lynch had their own similar investment vehicles. This development was a big disappointment for Ehrlich, who had lost an important part of his compensation package, his "back-ended equity." Ehrlich and Zlot discussed the need to look for another merger partner, and "Zlot assured me that if this piece were to be brought back, that I would participate. . . . Anyone else we found afterwards we'd have the same terms and conditions." In 2008 or 2009, Ehrlich left some of his share of management fees in the Fund because "[t]here could be a chance for me to buy a piece of the fund" or participate in another sale and Zlot said "for tax purposes it makes sense to keep some of your money in."

F. *Buyback of First Republic's Interest in Access Management LLC*

During 2009, Zlot and Ehrlich frequently spoke about their agreement that Ehrlich would participate in any merger, but the understanding was not put into writing. They

---

[9] Access Management, a subchapter S corporation, elected partnership tax treatment.

8

both looked for merger partners and referral sources for new investors. However, Zlot spent increasing amounts of time out of the office.

In about August 2009, Zlot negotiated with Bank of America to buy back First Republic's 24.9 percent interest in Access Management LLC for $150,000.[10] Ehrlich testified, "I was frustrated by this because . . . this was an opportunity that I could have potentially purchased some, if not all, of this 25 percent. . . . I had more money than [the $150,000 price] sitting in the [F]und . . . . I felt hurt." Zlot, however, assured Ehrlich "that we would find another partner; I would still be part of any succession and merger. And I agreed . . . to stick around and work on that."

G.      *Ehrlich's Termination*

In 2010, Ehrlich worked harder than ever, trying to attract investments and exploring alternative investment strategies. Zlot was spending much less time in the office, and his relationship with Ehrlich was less friendly. In September of that year, Ehrlich considered leaving Access Management. Because of an impending October 30 "lockup date"—the deadline for investors to withdraw investments from the Fund before the investments would be locked in for another calendar year—he wanted to talk to Zlot about whether they should continue working together or go their separate ways, with the investors free to move their money if they wished. Ehrlich had come to understand that he was Zlot's intended successor at Access Management, even though Zlot had never expressly said so. Ehrlich had been "brought to meetings of some of [Zlot's] older clients that had been in the [F]und, people that had been concerned about his age. [¶] [F]or First Republic meetings, I did almost all the . . . presentations the entire time [I was] there. . . . [¶] So it was kind of very clear to people that this was sort of the chain. And it was clear to me."

Zlot and Ehrlich met on October 15, 2010, two weeks before the October 30 lockup. Ehrlich told Zlot he "wanted to know where I really stood . . . . [¶] . . . If it

---

[10] Zlot represents on appeal that, while not reflected in the trial record, Access Management LLC was dissolved after this buyback.

9

wasn't going to work, that's fine, let's let the clients know . . . so they will have time to make a decision for themselves.  Otherwise, let's do something formal and give it a year option. . . . [¶] And I suggested I would work on a business plan.  He told me that he needed . . . everything updated first, all the marketing materials[,] . . . which I agreed to do."  Ehrlich suggested they have a check-in in six months and Zlot agreed.  Ehrlich understood that they would be "dedicating time to finding a third party to come in and help me buy Mr. Zlot out, where we could do some kind of phase-out."  The economy was starting to improve and the chances of finding a merger partner had increased.  Zlot took notes on the October 15, 2010 meeting.  He testified that termination was on his mind "[s]o I wrote it down so that I would have a record."  He did not, however, tell Ehrlich he was contemplating termination, and Ehrlich did not believe his position was in jeopardy or that he was under any sort of deadline to produce the business plan.

Zlot and Ehrlich met again on Friday, October 29, 2010, one day before the lockup.  Zlot asked why Ehrlich had not written a business plan yet, and Ehrlich said he was focused on updating the other materials.  Ehrlich said he could work on the plan outside business hours and Zlot did not seem "thrilled, but I didn't get the sense that I had done something wrong and I was in trouble."

On the evening of Saturday, October 30, 2010, Ehrlich was in a bar with friends watching the San Francisco Giants play in the World Series.  At 5:02 p.m., just after the lockup period expired,[11] Ehrlich received an e-mail from Zlot:  "You said that you had a plan in mind to grow the business in a 6 to 12 month period. . . . I was a little concerned on Friday that you were not ready to discuss these issues and needed more time to write up your plan. . . . [I]f you are serious about a plan that is real let's get it written up. . . . [G]et the write up to me by the end of the day on Tuesday and let's plan to meet at 3pm on Wednesday to discus[s]."

---

[11] In Zlot's view, the lockup period expired at 5:00 p.m. on October 30, 2010, and Fund investors could not withdraw their investments thereafter until October 30 of the following year.

Ehrlich worked on a business plan on Sunday and Monday and presented it to Zlot on Tuesday, November 2, 2010. In an introduction to the plan, he wrote: "*Please keep in mind this is a very rough first draft.*" The business plan listed possible strategies to increase investments, candidates for "minority investment/strategic partnership," "second level opportunities," changes in Fund offerings to attract investment, third party marketing alliances, and connections with consulting firms. Zlot read the plan and discussed it with Ehrlich on November 2. "[Zlot] said it was actually pretty good, but . . . it seemed like his mind had sort of been made up a little bit. . . . There wasn't much conversation." A meeting with one of the mutual funds on the "strategic partners" list (Reedland Capital) was already scheduled for the next day, and Ehrlich asked if Zlot wanted to go ahead with it. Ehrlich made clear "it was not my best idea." Zlot agreed to go ahead with the meeting.

On November 4, 2010, Zlot terminated Ehrlich. Zlot testified at trial that he was dissatisfied with the business plan and with Reedland Capital as a proposed merger partner. On November 4, he told Ehrlich he had known as early as 2005 that Ehrlich would never be his successor. Ehrlich asked Zlot why he had never said anything about this; Zlot did not respond. Zlot said he would pay Ehrlich his share of management fees through the end of November, "but it wasn't going to work out and it was time to move on, and I should consider what I wanted to say to tell people. [¶] . . . [¶] And then I turned in my card key, and I was out the door."

Ehrlich was paid through November 30, 2010. Ehrlich gave Zlot a list of investors who should be given an opportunity to withdraw their funds because of his departure; some of those investors were allowed to withdraw their investments, and did. Ehrlich also had extensive communications with Zlot about withdrawing his own investments from the Access Fund, and Zlot eventually allowed him to do so. Ehrlich did not receive any management fees or other remuneration from Access Management after

11

November 30, 2010.[12]  Ehrlich believed, although it had never been expressly stated orally or in writing, he was entitled under the terms of his engagement with Access Management to continue receiving his share of management fees on post-2004 investments even after he stopped working there.  His belief was based on the Agreement to split the revenue stream on post-2004 investments, and on industry custom and practice that fund employees continued to receive fees on clients they brought into a fund "as long as [the clients] are in the fund."  If Zlot had retired and Ehrlich had continued working at Access Management, Zlot also would have continued to receive 50 percent of those fees unless and until those investors withdrew their investments.

H.     *Gorelick Merger*

Around July 2011, Zlot started merger discussions with Gorelick Brothers Capital, LLC (Gorelick).  Gorelick managed a fund of funds with an investment strategy similar to that of the Access Fund.  Although the value of assets under management was only about $30 million, Gorelick's fund had a significant infrastructure:  five or six investment professionals and several support staff.  The companies agreed to merge because Gorelick needed additional assets and Access Management needed additional infrastructure.  The deal went into effect on January 1, 2012.

After leaving Access Management, Ehrlich was self-employed.  He worked on some projects that were consistent with his outside work while at Access Management: he helped pre-IPO Facebook employees gain liquidity by finding buyers for their shares or options and he helped find investors for a sports team.  In 2011, he made $700,000, and in the first five months of 2012 he made $1.2 million.  He had no income from mid-2012 to April 2013, although he was working on other long-term projects.

Economist Mark Cohen testified as Ehrlich's damages expert.  Cohen assumed that Ehrlich was entitled to a 50 percent share of management fees (less third-party

---

[12] In 2009, Ehrlich was paid $240,621 and he left some of his share of management fees in the Access Fund.  In 2010, he was paid $550,667, which included the funds he had left in the Access Fund in 2009.  In 2011, he was paid an additional $32,131 he was owed in 2010 management fees.

referral fees)[13] on investments in the Fund made during Ehrlich's tenure, and that Ehrlich had the right to continue receiving his share of those fees after termination. Cohen divided Ehrlich's damages into two categories: (1) Ehrlich's share of management fees between December 1, 2010, and the January 1, 2012 effective date of the merger ($321,290), and (2) Ehrlich's interest in the company as of the date of the merger, which Cohen valued as the present value of Ehrlich's anticipated share of management fees from the date of the merger to the end of Zlot's estimated life expectancy in 2023 ($959,371). Ehrlich's total damages under this calculation were $1,280,661.

## II. DISCUSSION

### A. *Exclusion of Expert Testimony*

Alan J. Andreini was designated by the defense as a testifying expert (Code Civ. Proc., § 2034.210, subd. (a)) in "financial industry customs and practices concerning non-equity and equity partnerships, profit-sharing, employment agreements, recruitment, job titles, and compensation structures, including 'trailers' or 'residuals' after a person leaves an organization." The defense described his expert qualifications as follows: "Alan J. Andreini has more than 20 years of experience in the financial industry. He has served as the chief executive officer, managing director, general partner, and/or chairman of hedge fund companies in California and New York. Mr. Andreini has an A.B. from Princeton University and a J.D. from Rutgers University Law School."

Ehrlich sought to introduce portions of Andreini's deposition testimony in his case-in-chief. Ehrlich made a written proffer to the court, designating approximately 50 pages of Andreini's deposition testimony that he wished to read to the jury on the following issues: "1. His opinion that the 50%-50% revenue split between Zlot and Ehrlich was 'high' for a person who allegedly was only hired as a 'marketing employee';

---

[13] Although the original compensation package also required deduction of First Republic's 8.25 percent share of the fees, First Republic and its successors no longer had an ownership interest in Access Management at the time of Ehrlich's departure. The record is not clear whether Ehrlich's share of management fees continued to be adjusted by this 8.25 percent amount after Zlot bought back the First Republic share of the company in 2009.

13

[¶] 2. His opinion that no particular 'documentation' (or any documentation at all) is customarily required to make a deal in the industry; [¶] 3. His opinion that while the 50%-50% revenue split would be highly atypical for a marketing employee, it is a common arrangement for a partnership in the industry; [¶] 4. His opinions on the customary meaning of certain titles in the industry; [¶] 5. His opinions on the use and dignity of certain marketing documents in the industry, including the 'due diligence questionnaire', client letters, and others; [¶] 6. His opinion that the structure of Mr. Ehrlich's compensation would be characterized as a 'draw' in industry custom; [¶] and 7. His opinion that it is not customary for employees in the financial services industry to be charged for non-sales related expenses, but is common among partnerships." (Record citations omitted.)  The trial court excluded the testimony.  Ehrlich argues that this was error.  We agree.

California Code of Civil Procedure section 2034.310, subdivision (a), permits a party to present the testimony of an expert witness who was not previously designated by that party if that expert was designated by another party and thereafter deposed.  (*Powell v. Superior Court* (1989) 211 Cal.App.3d 441, 444–445.)  It is undisputed that the defense designated Andreini as an expert witness and Ehrlich thereafter deposed him.  The testimony could nevertheless be excluded if irrelevant (Evid. Code, §§ 210, 350–352), improper (*id.*, § 801), or "its probative value [was] substantially outweighed by the probability that its admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" (*id.*, § 352).  We review the trial court's exclusion of this evidence for abuse of discretion.  (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639–640.)  "The trial court's discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.' [Citation.]"  (*Id.* at p. 640.)

In excluding the offered evidence, the trial court focused on the testimony's relevance.  As to the nature and amount of Ehrlich's compensation, the court said, "The idea that an expert would say that a 50/50 revenue split was high or low . . . is not really

14

of significance in this case because it's what was agreed to by the parties and it was paid." While Ehrlich could fairly argue he was "something more than, quote, 'just a marketing employee[,]' . . . the whole gist of the defense is it wasn't a partnership deal."

We disagree that the offered testimony was not relevant to the issues before the jury. While the gist of the defense was that no partnership existed, the gist of Ehrlich's case was otherwise. As explained *post*, whether the parties intended to form a partnership is a central issue that should have been submitted to the jury. Profit sharing is a factor that is relevant to whether a partnership was formed. In fact, profit sharing supports a presumption that a partnership has been created unless a jury finds the payment was nothing more than wages. (Corp. Code, § 16202, subd. (c)(3)(B).) Thus, evidence about whether payment of 50 percent of management fees is a typical payment of *wages* to a person with Ehrlich's responsibilities, or instead indicated he had the status of partner, was relevant.

The trial court ruled generally that "what is being offered [through Andreini's testimony] . . . relates to various . . . custom-and-practice interpretation of terms. And what we have here is direct testimony from the two participants, each of whom worked in an industry but, more important, each of whom was testifying to their intentions in doing what they did or refrained from doing, orally or in writing. [¶] And although [section] 1645 of the Civil Code indicates . . . , 'technical words are to be interpreted as usually understood by persons in the profession or business to which they relate unless clearly used in a different sense'—this all seems cumulative. Because both these individuals who worked in the hedge fund industry have given their view of what these terms mean. [¶] And I don't think they are really technical terms." Finally, the court also said the proffered testimony "comes . . . too close . . . [to] an expert arguing [the] legal effect of things."

Again we disagree. When interpreting any contract, including a contract to form a partnership, " ' "[t]he existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." [Citation.]' [Citation.]" (*Beard v. Goodrich* (2003) 110

15

Cal.App.4th 1031, 1040.) It is undisputed that the parties here did not expressly state in their Agreement whether their business arrangement was a partnership or an employment relationship. Ehrlich contends that he reasonably believed, based on the terms of the agreement and industry practice, that he had entered into a partnership with Zlot. Evidence that his understanding was consistent with industry custom and practice was therefore relevant to the jury's determination of whether Ehrlich's understanding was objectively reasonable. Moreover, Andreini's testimony about industry practice (a subject within his area of expertise) potentially carried more weight than Ehrlich's or Zlot's self-interested testimony on the subject. As to the legal effect of the Agreement, Andreini did not testify that Zlot and Ehrlich's agreement was a partnership agreement. In fact, he testified that he viewed the arrangement primarily as a marketing agreement. He simply acknowledged that Ehrlich's 50 percent share of certain revenues and sales proceeds, as well as other elements of the Agreement, were inconsistent with industry practice for a marketing agreement. The jury should have been given the opportunity determine the significance of those inconsistencies.

The court made no finding that the proffered evidence would have been unduly time consuming, and it is difficult to see how the reading of relatively few pages of deposition testimony could be so. Nor did the court find that the evidence would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. It found only that the testimony would not be "substantially helpful to the jurors' understanding of the facts," and it seemed to view the evidence as irrelevant or cumulative. Testimony related to custom and practice in an industry not within the knowledge and understanding of a lay jury was a proper subject for expert testimony. The evidence was, in our view, highly relevant to disputed material issues in the trial— whether the parties had an employer/employee relationship or a partnership—and the court abused its discretion in precluding the jury from hearing it.

B.    *Motion for Directed Verdict*

At the close of evidence, Defendants moved for directed verdicts on all causes of action. The court granted the motion, and subsequently entered a "Statement of Decision

16

on Equitable Causes of Action" denying all equitable claims. The statement of decision also, however, made credibility determinations and resolved factual questions at issue in Ehrlich's legal causes of action. Judgment in favor of Defendants was entered on June 27, 2013. Ehrlich argues the trial court erred in directing a verdict in favor of Defendants. We agree.

We consider whether substantial evidence was proffered to prove each of Ehrlich's claims, indulging every legitimate inference which may be drawn from Ehrlich's evidence and disregarding conflicting evidence. (*North Counties Engineering, Inc. v. State Farm General Ins. Co., supra,* 224 Cal.App.4th at p. 919.)

1. *Breach of Partnership Agreement*

Under the Uniform Partnership Act of 1994 (UPA; Corp. Code, § 16100 et seq.),[14] with exceptions not relevant here, "the association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership." (§ 16202, subd. (a).) "In determining whether a partnership is formed, the following rules apply: [¶] . . . [¶] (2) The sharing of gross returns does not by itself establish a partnership . . . . [¶] (3) A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received for any of the following reasons: [¶] . . . [¶] (B) In payment for services as an independent contractor or of wages or other compensation to an employee." (*Id.*, subds. (c)(2), (c)(3)(B); see also § 16101, subd. (9) [definition of "partnership"].) A partnership agreement need not be in writing but may be oral or implied, and a partner may be terminable at will. (§ 16101, subds. (10)–(11).)

"*Generally*, a partnership connotes co-ownership in partnership property, with a sharing in the profits and losses of a continuing business. [Citation.]" (*Chambers v. Kay* (2002) 29 Cal.4th 142, 151, italics added & fn. omitted.) Zlot argues that co-ownership is an *essential* element of partnership formation. However, the authorities he cites either do

---

[14] Undesignated statutory references are to the Corporations Code.

17

not so hold or predate the enactment of the UPA.[15]  This district has held that, under the current version of the UPA,[16] no single factor is essential to partnership formation:  "[t]he presence or absence of any of the various elements . . . , including sharing of profits and losses, is not necessarily dispositive. . . . [T]he rules to establish the existence of a partnership . . . should be viewed in the light of *the crucial factor of the intent of the parties revealed in the terms of their agreement, conduct, and the surrounding circumstances* when determining whether a partnership exists."  (*Holmes, supra,* 74 Cal.App.4th at p. 454, italics added.)  Zlot also argues comanagement is an essential element of a partnership.  Again, the cases he cites either do not so hold, are outdated, or are distinguishable.[17]  Zlot cites section 16401, subdivision (f), which provides that

---

[15] *Greene v. Brooks* (1965) 235 Cal.App.2d 161, 165, simply cites the definition of a partnership as "an association of two or more persons to carry on a business for profit *as coowners*" and does not support the argument that shared property ownership is required to establish a partnership.  (Italics added.)  *People v. Holtz* (1927) 85 Cal.App. 450 predates the UPA, and *Brockman v. Lane* (1951) 103 Cal.App.2d 802 addresses a business relationship that was formed before the UPA went into effect.  (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 453 (*Holmes*) [UPA first enacted in 1949].)

[16] In interpreting former section 15007 of the pre-1999 version of the UPA (former § 15001 et seq.), *Holmes, supra,* 74 Cal.App.4th 442 implicitly recognizes that the current version of the law that became effective in 1999 (§ 16100 et seq.) was materially indistinguishable.  (*Holmes,* at pp. 453–454 & fns. 12, 14.)  Former section 15007 (as amended by Stats. 1976, ch. 1171, § 6, p. 5252) was substantially identical to current section 16202, subdivision (c), except that profit sharing was deemed "prima facie evidence" of a partnership rather than the basis for an evidentiary presumption as in the current statute.  (See *Holmes*, at p. 454, fn. 14.)

[17] *Billups v. Tiernan* (1970) 11 Cal.App.3d 372, 379 cites *Greene v. Brooks, supra,* 235 Cal.App.2d at page 166, which in turn cites *Rosenberg v. Broy* (1961) 190 Cal.App.2d 591, 597 ("[t]he existence of a partnership is *ordinarily* evidenced by the right and obligation of the partners to participate . . . in the management and control of the business" (italics added)).  Similarly, *People v. Park* (1978) 87 Cal.App.3d 550, 564 cites *Holtz v. United Plumbing & Heating Co.* (1957) 49 Cal.2d 501, 506–507—a wrongful death case specifically distinguished by *Holmes, supra,* 74 Cal.App.4th at page 455—and cases acknowledging that joint management is common in partnerships (*Constans v. Ross* (1951) 106 Cal.App.2d 381, 386; *Kersch v. Taber* (1945) 67 Cal.App.2d 499, 504).  However, *Constans* specifically held that "apportionment of

18

"[e]ach partner has equal rights in the management and conduct of the partnership business." However, he overlooks section 16103, subdivision (a), which provides, "Except as otherwise provided in subdivision (b), relations among the partners and between the partners and the partnership are governed by the partnership agreement. *To the extent the partnership agreement does not otherwise provide,* this chapter governs relations among the partners and between the partners and the partnership." (Italics added.) Evidence that Zlot and Ehrlich did not equally share in management of Access Management, therefore, does not necessarily defeat Ehrlich's claim that they formed a partnership because they could have agreed to an unequal allocation of management responsibilities—as Ehrlich testified they did.

Our colleagues in Division One previously affirmed an order denying a motion for judgment notwithstanding the verdict after a jury found an oral partnership agreement had been created and breached. (*Holmes, supra,* 74 Cal.App.4th at pp. 452, 459–460.) Sandra Lerner was an "extremely wealthy" and sophisticated businesswoman; her personal friend, Patricia Holmes, was not. While Lerner and Holmes were socializing, Holmes created a nail polish color and named it "Plague." Together, Lerner and Holmes came up with similar polish names and a marketing concept, "Urban Decay." Lerner suggested they start a company and Holmes agreed. As business development progressed, Holmes worked without pay and served on the de facto board of directors, but became increasingly marginalized. She asked to memorialize her partnership agreement with Lerner, which she understood to be 50/50 co-ownership, and was told she had at most a 5 percent interest in the company. She then sued, and a jury found inter alia that Lerner and Holmes had formed a partnership and that Lerner had breached their agreement and violated her fiduciary duties. (*Id.* at pp. 445–452.)

The *Holmes* court found the evidence supported the verdict and rejected Lerner's argument that the oral agreement was too indefinite to enforce. "The agreement here, as

duties [between partners] does not preclude the existence of a partnership. One partner may be given the right of management. [Citations.]" (*Constans*, at pp. 388–389.)

19

presented to the jury, was that Holmes and Lerner would start a cosmetics company based on the unusual colors developed by Holmes, identified by the urban theme and the exotic names. The agreement is evidenced by Lerner's statements: 'We will do . . . everything,' '[i]t's going to be our baby, and we're going to work on it together.' . . . 'We will hire people to work for us.' 'We will do . . . everything we can to get the company going . . . .' The additional terms were filled in as the two women immediately began work on the multitude of details necessary to bring their idea to fruition." (*Holmes, supra,* 74 Cal.App.4th at pp. 458–459.) "Certainly implicit in the Holmes-Lerner agreement to operate Urban Decay together was an understanding to share in profits and losses as any business owners would." (*Id.* at p. 457.)

Here, substantial evidence would support a finding that Zlot and Ehrlich formed a partnership in post-2004 Access Management business. Their Agreement bore several hallmarks of a partnership: profit sharing, expense sharing, comanagement, entrepreneurial purpose, and use of the title, "partner." Zlot and Ehrlich agreed to share the revenue stream on post-2004 investments 50/50 and they agreed to share 50/50 in the proceeds of an anticipated sale that derived from post-2004 investments. When the anticipated sale fell through, they agreed to jointly search for a new merger partner and share in the proceeds of such a sale on similar terms. When business declined, Ehrlich shared in company expenses. Zlot and Ehrlich shared management responsibilities in practice even if Zlot held greater legal authority: they both managed the investment portfolio and recruited new investors, and they jointly consulted on marketing materials and personnel decisions. Moreover, the very purpose of Ehrlich's joining the firm was entrepreneurial—to build the business in conjunction with Zlot—rather than to provide a discrete skill or service to the enterprise. Zlot and Ehrlich also represented to others and each other that Ehrlich held the position of a "partner," "principal," and "co-portfolio manager" at Access Management.

Zlot places great significance on Ehrlich's lack of formalized equity ownership in Access Management, his subchapter S corporation, contrasting First Republic's documented 24.1 percent interest from 2004 to 2009 in Access Management LLC.

However, the terms of Ehrlich's engagement could reasonably be viewed as granting him the equivalent of a 50 percent ownership interest in the post-2004 *business* of Access Management, by granting him a right to a coequal share in management fees on post-2004 investments in the Fund. First Republic purchased a formal 24.9 percent ownership interest in Access Management LLC and received a right to share in the management fees on all Fund investments. The jury could reasonably have found the benefits were tantamount to an ownership interest. Notably, when Zlot asked Ehrlich to share in the expenses of closing a fund during the economic downturn, Ehrlich agreed to do so in proportion to his financial interest, another indication that his interest was perceived as tantamount to ownership.

Zlot argues Ehrlich is trying to obtain contract benefits that he failed to negotiate in the Agreement: a right to share in the Fund revenue stream even after his departure (a "tail") and a right to share in the proceeds of a sale or merger even if the anticipated First Republic deal was not consummated. It is true that the March 2006 e-mail is silent about what, if anything, Ehrlich was entitled to receive if the First Republic sale fell through. However, if the jury found Ehrlich and Zlot's business arrangement to be a partnership, gaps in the agreement could be supplemented by the UPA and the conduct of the parties. (See *Holmes, supra,* 74 Cal.App.4th at p. 457 ["[o]nce the elements of [section 16202, subdivision (a)'s definition of a partnership] are established, other provisions of the UPA and the conduct of the parties supply the details of the agreement"].) As stated *ante*, the UPA provides default partnership agreement terms where such agreements are silent. (§ 16103.) If a partner departs and the partnership continues, the dissociated partner must be paid for his interest in the partnership. (§ 16701.) When a partnership is terminated, its affairs must be wound up and each partner's account credited with the partner's share of assets remaining after payment of liabilities. (§ 16807.) Thus, the absence of these terms from the March 2006 e-mail is not necessarily fatal to Ehrlich's claims.

2.      *Breach of Employment Agreement*

Ehrlich argues that he produced substantial evidence that, if he failed to establish a partnership with Zlot, he nevertheless had an employment contract that guaranteed him

compensation even after he was terminated.  The trial court did not expressly address whether Ehrlich had produced substantial evidence that Zlot breached an employment contract with him, but impliedly did so in granting a directed verdict on all of Ehrlich's claims.  The trial court found in its statement of decision that the March 2006 e-mail was "not susceptible to the interpretation that it entitles [Ehrlich] to a revenue share in perpetuity," suggesting that the claim was barred as a matter of law.  We conclude the trial court erred in granting a directed verdict on the claim for breach of an employment contract.

>        a.        *At-Will Contract May Provide for Posttermination Compensation*

There is no inherent inconsistency between at-will employment and a posttermination obligation to pay continuing commissions on sales generated by the employee during his employment.  To the extent the trial court found that the March 2006 e-mail was not susceptible to an interpretation that Ehrlich could receive posttermination revenue from investments he brought to the fund, we disagree.  In *Reilly v. Inquest Technology, Inc.* (2013) 218 Cal.App.4th 536 (*Reilly*), a person with experience and connections in the high-tech electronic industry (Reilly) agreed to help a start-up computer hardware company (Inquest) expand.  (*Id.* at pp. 540–541.)  The employment contract provided that "the [ownership] structure of the company" would not be changed initially, but Reilly would " 'be employed by the company and given the title of "Vice President of Business Development[."] . . . [¶] . . . 'It is agreed that any jobs, orders or contacts that [Reilly] brings to the company that result in orders being placed with the company . . . , then the profits from these activities will be shared equally with [Reilly]." (*Id.* at p. 542.)  Reilly attracted a client to Inquest, who placed additional orders after Reilly had stopped working for Inquest.  (*Id.* at pp. 543–544.)  Reilly sued for a 50 percent commission on all orders from that client, including those placed after he left the company.  A jury ruled in Reilly's favor and awarded him more than $2 million in damages.  (*Id.* at p. 544.)

The Court of Appeal affirmed.  "Inquest makes a factual argument there was no evidence Reilly was anything more than an ordinary salesperson, hired to get specific

orders from [the client] and, therefore, his right to commissions ended with his separation from the company.  Inquest also asserts Reilly asked for the title of vice president of business marketing simply to help him gain better access to potential customers and not because he expected a bigger stake in the company's long-term profits. . . . [¶] By its plain terms, the agreement created a business relationship contemplating much more than the hiring of an ordinary salesman.  The agreement stated Reilly was expected to grow the company based on his experience and contacts in the business.  As in a partnership, he was promised 50 percent of the profits from all the business he generated, and he was promised a greater reward in the future if things went well. . . . The jury properly interpreted the contract as providing a commission for not only simple one-time orders, but also for profits generated by longer term jobs and ongoing renewable orders from new customers." (*Reilly, supra,* 218 Cal.App.4th at pp. 555–556.)

Zlot argues that Ehrlich's construction of the Agreement improperly requires perpetual performance, citing *Nissen v. Stovall-Wilcoxson Co.* (1953) 120 Cal.App.2d 316, 319—a case also cited by the trial court in rejecting Ehrlich's interpretation of the March 2006 e-mail.  The *Reilly* court acknowledged that " 'a contract will not be construed to call for perpetual performance unless the language of the contract unequivocally compels such construction.' [Citations.]" (*Reilly, supra,* 218 Cal.App.4th at p. 553.)  However, it rejected the argument that a posttermination revenue stream of indefinite duration is necessarily barred as a perpetual contractual obligation.  Under the court's construction of the contract with Inquest, Reilly's "right to receive commissions was limited to profits that 'resulted from' Reilly's activities.  A causal connection was required and the obligation did not necessarily last indefinitely." (*Reilly, supra,* 218 Cal.App.4th at p. 553.)  Similarly here, Ehrlich's right to continue to receive a 50 percent share of management fees on post-2004 investments was of limited duration even if it continued after his termination date—he would be entitled to receive those fees only until investments resulting from his efforts were withdrawn from the Access Fund. (See *Lura v. Multaplex, Inc.* (1982) 129 Cal.App.3d 410, 413 ["[s]ince respondent's obligation to appellant is contingent [on] sales to the accounts he secured, the agreement

23

is of limited duration—until respondent stops selling to those accounts"].) Moreover, Ehrlich's right to continued participation in the Access Management revenue stream faced the practical limitation that Zlot planned to retire and sell the company. In any event, perpetual obligations are disfavored but not outright prohibited in employment contracts. (See *Schwartz v. Teunisz* (1946) 77 Cal.App.2d 258, 263 [interpreting sales commission contract as "a continuing contract extending even beyond the grave, for it provided for conditions covering the estates of the parties and even as to the legal obligations of the 'heirs, executors, administrators and assigns of each of the parties' "].) Therefore, the fact that perpetual obligations may be disfavored does not defeat Ehrlich's employment claim as a matter of law.

Finding no legal prohibition on an at-will employment contract that provides for posttermination compensation, we consider whether there was substantial evidence that the Agreement entitled Ehrlich—after *involuntary* termination—to share in the revenue stream from post-2004 investments or sales proceeds of the company to the extent those proceeds were based on post-2004 investments. Assuming the jury found that Ehrlich failed to prove he and Zlot intended to create a partnership, both parties agree the jury would have been required to interpret the Agreement as an employment contract.

"The overriding goal of contract interpretation is to give effect to the mutual intention of the parties at the time of contracting, 'so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) Faced with contract language that is reasonably susceptible to more than one meaning, certain general rules of contract interpretation come into play to aid the court in resolving the ambiguity. (See *id.*, § 1637.) To begin with, the words of a contract are to be understood in their ordinary and popular sense unless the parties use them in a technical sense or 'a special meaning is given to them by usage . . . .' (*Id.,* § 1644.) . . . [¶] Further, we can explain a contract by reference to the circumstances under which it was made, as well as the matter to which it relates. ([*Id.*], § 1647.) . . . [¶] The terms of a writing can also 'be explained or supplemented by course of dealing or usage of trade or by course of performance.' (Code Civ. Proc., § 1856, subd. (c).) . . . [¶] Extrinsic evidence on all these circumstances and matters can be

24

offered [not only] where it is obvious that a contract term is ambiguous, but also to expose a latent ambiguity." (*Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1240–1241.) Because the 2006 e-mail was not an integrated writing (i.e., did not purport to be a complete and final expression of the Agreement's terms), the jury could rely on extrinsic evidence to infer that the parties agreed to different or additional terms than were expressed in the e-mail. (See *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174.) The jury was also free to infer unwritten terms as necessary to effectuate the parties' mutual intent. (See *Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 569–570.)

Employment is statutorily presumed to be at-will, that is, terminable by either party at any time with or without cause. (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335.) However, as discussed *ante*, even an at-will employment contract may require an employer to pay posttermination compensation. It is undisputed that at the time the parties made their Agreement they did not discuss whether Ehrlich would be entitled to posttermination compensation or whether he would be entitled to alternative compensation if the First Republic deal fell through. They did not consider either possibility because the evidence indicated they both expected Ehrlich would work for Access Management until the company was sold to First Republic in 2009. Zlot testified that he believed he had the power to terminate Ehrlich under their original Agreement, at which point Ehrlich's right to compensation would cease. Ehrlich testified that he understood the Agreement to entitle him to 50 percent of fees on investments made during his tenure at Access regardless of whether he left the company, just as Zlot was entitled to 50 percent of those fees even if he retired.

While a contrary conclusion might be equally justified by the evidence, a jury could find that the Agreement provided that Ehrlich was entitled to 50 percent of the present and future value generated by post-2004 investments in the Access Fund, regardless of whether he was terminated or the First Republic sale occurred. According to Andreini, it was not uncommon for hedge fund industry employees to have "tail"

25

agreements entitling them to compensation after their departure from a firm. Thus, an interpretation of the Agreement that Ehrlich was entitled to posttermination compensation based on assets under management at the time of his departure would be consistent with industry practice.[18]

Zlot argues that the plain language of the March 2006 e-mail—that Ehrlich and Zlot would "[s]plit all gross revenue on new capit[a]l invested in the Access Fund Management LLC by new and existing investors from January 1, 2005[. T]his *shall be paid against the $150,000 base salary*" (italics added)—expressly tied Ehrlich's right to share in management fees to his entitlement to receive a salary, which in turn was tied to continued employment at Access Management. The base salary provision, however, merely guaranteed Ehrlich minimum compensation during a time when he was actively engaged in management and in generating new business for the company. Following his termination, he was no longer required to provide services to Access, but his share of management fees could only remain constant or decrease.

The evidence also could support a jury conclusion that Zlot and Ehrlich agreed to an oral modification of the Agreement's terms to include compensation in the event "of any succession and merger" with a different purchaser if the First Republic acquisition was not viable. Ehrlich testified that Zlot agreed in early 2009, and again after Zlot's mid-2009 buyback of the First Republic interest in Access, that Ehrlich would participate in an alternative merger deal and that neither agreement was contingent upon Ehrlich's procurement of a merger partner.

> b. *Breach of Implied Covenant of Good Faith and Fair Dealing*

A jury could also find that Zlot breached the covenant of good faith and fair dealing in his employment contract with Ehrlich. " ' "Every contract imposes upon each

---

[18] Ehrlich does not contend that he was entitled to the base salary after his termination from the company, nor does he contend that he was entitled to a share of management fees on investments made after his termination. The parties only dispute whether, following his termination, Ehrlich was entitled to a share of management fees on investments that had been made while he worked at Access Management.

party a duty of good faith and fair dealing in its performance and its enforcement." [Citation.] . . . ' [¶] . . . [¶] [T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.]" (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 371, 373.) For the implied covenant to be imposed, " ' "the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; . . . [and] it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it . . . ." ' [Citations.]" (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 804.)

Zlot argues the implied covenant cannot help Ehrlich here because it cannot create terms that have no foundation in the parties' actual agreement. However, the jury could have found on the trial evidence that a material element of the inducement for Ehrlich to join Access Management was Zlot's promise that Ehrlich would share in any equity he created in the company when it was sold or merged. A jury could find that Zlot breached the implied covenant by forcing Ehrlich out of the company on a pretext and then within a few months arranging a deal from which Ehrlich was excluded.

### c.      *Breach of Contract Damages*

Zlot suggests on appeal that Ehrlich incurred no damages from the alleged breach of his employment contract because Ehrlich ultimately earned more following his termination than he had while working with Access Management. Ehrlich, however, presented evidence that his posttermination earnings were not derived from regular employment but from entrepreneurial activity that he would have been able to pursue even if still engaged at Access Management. In any event, we have concluded the evidence supported a finding of entitlement to posttermination compensation regardless of other employment.

### d.      *Fraud, Negligent Misrepresentation, and Promissory Estoppel*

Ehrlich's claims for fraud, negligent misrepresentation and promissory estoppel all required proof of detrimental reliance. (See *McClain v. Octagon Plaza, LLC* (2008) 159 Cal.App.4th 784, 792–793 [fraud and negligent misrepresentation]; *Toscano v.*

27

*Greene Music* (2004) 124 Cal.App.4th 685, 692 [promissory estoppel].) The trial court's statement of decision does not expressly address the fraud and negligent misrepresentation claims, but explains that a directed verdict on the promissory estoppel claim was based in part on Ehrlich's failure to prove detrimental reliance. Ehrlich argues on appeal that Zlot induced him to leave Merrill Lynch by promising him a share of the First Republic sale and thereafter induced him to stay at Access Management by promising him a share in a substitute deal. However, Ehrlich cites no evidence in the record that he would have earned more money or received greater benefit if he had stayed at Merrill Lynch or left Access Management before his termination. Therefore, we agree with the trial court that Ehrlich failed to produce evidence of detrimental reliance and accordingly affirm the trial court's grant of directed verdict on all three of these claims.

       3.    *Equitable Claims*

       In adjudicating the equitable claims, the court's statement of decision made several findings of material fact which also were central to Ehrlich's legal claims. The court erred in doing so.

       The findings, adopted largely in the form submitted by Defendants, not surprisingly recite the evidence in the light most favorable to Defendants. To make those findings, the court did precisely what it may not do in these circumstances—it weighed and evaluated conflicting evidence, assessed the credibility of testimony, and ignored or rejected evidences and inference favorable to Ehrlich. If the court believed Ehrlich's evidence was not reliable or credible and preponderated against the verdict, it retained the power to grant a new trial in the event of a plaintiff's verdict, notwithstanding substantial evidence. (*Estate of Lances, supra,* 216 Cal. at p. 401 ["[a]lthough the trial court may weigh the evidence and judge of the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict"].)

       And while the court is entitled to make its own findings on trial of purely equitable issues, it may not do so where the legal issues are tried first and where the facts are, or should have been, decided by the jury. The jury's factual findings on legal causes of action would bind the trial court when granting ancillary equitable remedies based on the

28

same facts.  (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 159–161.)  Because we found a directed verdict was improperly granted as to all but three causes of action, the factual predicates for resolution of the equitable claims have not been provided and judgment as to those claims must necessarily be vacated pending a jury determination of the facts.

C.      *Motion to Tax Costs*

Because we vacate the judgment, the trial court's award of costs to Defendants must also be vacated.  Accordingly, Ehrlich's appeal of the order denying his motion to tax costs is dismissed as moot.

### III.      DISPOSITION

As to appeal No. A139567, the judgment and award of costs are vacated.  The order granting a directed verdict is reversed except as to the claims for fraud, negligent misrepresentation, and promissory estoppel.  Appeal No. 139829 regarding the order denying Ehrlich's motion to tax costs is dismissed as moot.  Defendants shall bear Ehrlich's costs in appeal No. A139567, and the parties shall bear their own costs in appeal No. A139829.

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.